# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-2502

_____

Southern Wine and Spirits of America, Inc.; Southern Wine and Spirits of Missouri, Inc.; Harvey R. Chaplin; Wayne E. Chaplin; Paul B. Chaplin; Steven R. Becker,

*Plaintiffs - Appellants*,

v.

Division of Alcohol and Tobacco Control; Lafayette E. Lacy, Supervisor of Alcohol & Tobacco Control,

*Defendants - Appellees*,

------------------------------

Missouri Beverage Company,

*Amicus on Behalf of Appellant*,

National Beer Wholesalers Association; Missouri Wine and Spirits Association; Missouri Beer Wholesalers Association; Attorney General of Arkansas; Attorney General of Delaware; Attorney General of Mississippi; Attorney General of Nebraska; Attorney General of South Dakota; Attorney General of Texas; Attorney General of West Virginia; American Beverage Licensees,

*Amici on Behalf of Appellee*s.

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: April 9, 2013
Filed: September 25, 2013
_____

Before COLLOTON and SHEPHERD, Circuit Judges, and ROSE,[1] District Judge.
_____

COLLOTON, Circuit Judge.

Southern Wine & Spirits of Missouri, Inc. ("Southern Missouri") applied for a license to sell liquor at wholesale in Missouri. The Division of Alcohol and Tobacco Control of the Missouri Department of Public Safety ("the Division") denied the application, because Southern Missouri does not satisfy a residency requirement that applies to liquor wholesalers' officers, directors, and shareholders under Missouri law. Southern Missouri, its parent company Southern Wine & Spirits of America, Inc. ("SWSA"), and four individuals brought this action, challenging the constitutionality of the residency requirements. The district court[2] upheld the statute, and we affirm.

I.

Missouri funnels liquor sales through a tier system, separating the distribution market into discrete levels: the first tier consists of producers, such as brewers, distillers, and winemakers; the second tier is comprised of solicitors, who acquire alcohol from producers and sell it "to, by or through" wholesalers; the third tier is made up of wholesalers, who purchase alcohol from producers or solicitors and sell

_____

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

it to retailers; and the fourth tier consists of retailers, who sell alcohol to consumers. *See* Mo. Rev. Stat. §§ 311.180(1), 311.200. Any individual or corporation who "manufacture[s], sell[s], or expose[s] for sale . . . intoxicating liquor" in Missouri must first "tak[e] out a license." *Id.* § 311.050. To obtain a wholesaler license "for the sale of intoxicating liquor containing alcohol in excess of five percent by weight," a corporation must be a "resident corporation." *Id.* § 311.060.2(3).

To be a "resident corporation," the corporation must be incorporated under the laws of Missouri, and all of its officers and directors must be "qualified legal voters and taxpaying citizens of the county . . . in which they reside" and have been "bona fide residents" of Missouri for at least three years. *Id.* § 311.060.3. "[A]ll the resident stockholders . . . shall own, legally and beneficially, at least sixty percent of all the financial interest in the business to be licensed under this law." *Id.* The residency requirement also contains a so-called grandfather clause, which exempts corporations licensed as wholesalers as of January 1, 1947, or "any corporation succeeding to the business of [such] a corporation . . . as a result of a tax-free reorganization." *Id.* One corporation is licensed as a wholesaler in Missouri despite its noncompliance with the residency requirement, because it satisfies the terms of the grandfather clause.

SWSA, a Florida corporation, is a distributor of wine, spirits, beer, and various non-alcoholic beverages, with operations in 32 states and the District of Columbia. Collectively, four Florida residents own over 97 percent of SWSA's voting shares and more than 51 percent of all shares. Southern Missouri is incorporated in Missouri and is a wholly owned subsidiary of SWSA. In July 2011, Southern Missouri applied to the Division for a wholesaler-solicitor license to which the residency requirement applies. On its application, Southern Missouri stated that its sole shareholder is SWSA, and that its officers and directors are Florida residents. The Division denied Southern Missouri's application, because Southern Missouri failed to "qualify as a resident corporation" within the meaning of the statute.

-3-

SWSA, Southern Missouri, and four Florida residents who are shareholders of SWSA and officers or directors of SWSA and Southern Missouri (collectively, "Southern Wine") brought this action against the Division and the Supervisor of the Division in his official capacity, challenging the constitutionality of the residency requirement and seeking declaratory and injunctive relief. Both sides moved for summary judgment. As relevant to this appeal, Southern Wine asserted in the district court that the residency requirement discriminates against out-of-state corporations, in violation of the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment. Southern Wine argued, as it does on appeal, that the residency requirement is constitutionally infirm, because it does not advance any legitimate state interest. Southern Wine relied on the existence of the grandfathered out-of-state wholesaler and the deposition testimony of the Division's deputy supervisor indicating that he did not think licensing Southern Missouri as a wholesaler would erode Missouri's liquor-distribution system.

The Division conceded that conditioning wholesaler licenses on the in-state residency of officers, directors, and a super-majority of shareholders discriminates against interstate commerce. The Division maintained, however, that the residency requirement is authorized by § 2 of the Twenty-first Amendment, which prohibits "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." The Division further argued that the requirement does not violate the Equal Protection Clause because, among other reasons, it is rationally related to the State's interest in ensuring that liquor wholesalers are publicly accountable.

The district court granted the Division's motion for summary judgment and denied Southern Wine's. Southern Wine now appeals.

II.

This case involves the intersection of what has come to be known as the "dormant" or "negative" Commerce Clause and the Twenty-first Amendment. Typically, the Commerce Clause forbids a State to discriminate against out-of-state residents: laws that provide for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" have been considered "virtually *per se* invalid." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Or.*, 511 U.S. 93, 99 (1994). The Twenty-first Amendment, however, provides that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2. This provision thus grants States certain prerogatives particular to the regulation of alcohol.

Over time, the Supreme Court has sent conflicting signals about the relationship between these two constitutional provisions. Early cases interpreting the Twenty-first Amendment appeared to say that § 2 immunized state liquor regulations from scrutiny under the Commerce Clause. In 1936, three years after the ratification of the Twenty-first Amendment, the Court explained:

> The words used [in § 2] are apt to confer upon the state the power to forbid all importations which do not comply with the conditions which it prescribes. The plaintiffs ask us to limit this broad command. They request us to construe the amendment as saying, in effect: The state may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the amendment, but a rewriting of it.

*State Bd. of Equalization of Cal. v. Young's Mkt. Co.*, 299 U.S. 59, 62 (1936).

Over the ensuing decades, however, the Court has declined to accept this broad view of the Twenty-first Amendment. In 1964, the Court in *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324 (1964), held that the Commerce Clause prohibited New York from denying a license to an airport-based liquor retailer. Because the liquor sold by this retailer was not delivered to customers until their flights arrived at their ultimate destinations outside New York, the Court determined that the State had sought unconstitutionally to regulate liquor distribution *outside* its borders, rather than "to regulate or control the passage of intoxicants through her territory in the interest of preventing their unlawful diversion into the internal commerce of the State." *Id.* at 333. The Court said it would be "an absurd oversimplification" to describe the ratification of the Twenty-first Amendment as "somehow operat[ing] to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned." *Id.* at 331-32. The conclusion that the Twenty-first Amendment left Congress "with no regulatory power over interstate or foreign commerce in intoxicating liquor," the Court continued, "would be patently bizarre and is demonstrably incorrect." *Id.* at 332. Instead, the Court reasoned that "[b]oth the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case." *Id.*

Although the Court later observed that *Hostetter*'s language "may have come uncommonly close to hyperbole," it affirmed that "the basic point was sound." *Granholm v. Heald*, 544 U.S. 460, 487 (2005). So after *Hostetter*, the Court continued what it described as a "pragmatic effort to harmonize state and federal powers." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 109 (1980). On one side of this balance, the Twenty-first Amendment granted the States "virtually complete control over whether to permit importation or sale of liquor

and how to structure the liquor distribution system." *Id*. at 110. This virtually complete control over the structure of the liquor distribution system includes the States' prerogative to establish the so-called "three-tier system." *Granholm*, 544 U.S. at 466-67, 488-89. In other words, a State may, at a minimum, require separation among the various levels of the distribution chain to control the importation and sale of liquor within its borders. *See North Dakota v. United States*, 495 U.S. 423, 428, 432 (1990) (plurality opinion).[3]

On the other side, "when a State has not attempted directly to regulate the sale or use of liquor within its borders—the core § 2 power—a conflicting exercise of federal authority may prevail." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 713 (1984); *see also Midcal*, 445 U.S. at 110 ("Although States retain substantial discretion to establish *other* liquor regulations, *those controls* may be subject to the federal commerce power in appropriate situations.") (emphases added). In a decision involving a State's resale pricing system for alcohol, the Court remarked that "[t]he question in each case is whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 347 (1987) (internal quotation omitted).

*Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984), established that "mere economic protectionism" is not a "clear concern" of the Twenty-first Amendment. That case involved a challenge to a Hawaii tax exemption applicable only to certain locally produced liquors. The Hawaii Supreme Court had concluded in an earlier stage of the proceeding that the "undisputed . . . purpose of the exemption was to aid

---

[3]Although Missouri's distribution system contains a fourth tier of solicitors, Southern Wine concedes that "[t]hat licensure category does not alter the basic features of the three-tier system and is not relevant to this appeal." Appellant's Br. 10 n.2.

Hawaiian industry." *Id.* at 271. In that context, the Court explained that "[d]oubts about the scope of the [Twenty-first] Amendment's authorization notwithstanding, one thing is certain: The central purpose of the provision was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.* at 276. The Court noted the "strong federal interests" of the Commerce Clause in "preventing economic Balkanization," and concluded that "[s]tate laws that constitute mere economic protectionism are . . . not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Bacchus*, 468 U.S. at 276. Because the protectionist tax was "not supported by any clear concern of the Twenty-first Amendment" and violated a "central tenet of the Commerce Clause," it was unconstitutional. *Id.*

*Granholm* is the Court's most recent pronouncement on the subject. There, the Court considered regulations of two States that permitted in-state wineries to ship their products directly to in-state consumers. 544 U.S. at 468-70. Generally, Michigan and New York both funneled liquor distribution through their respective versions of the three-tier system. *Id.* The regulations at issue, however, worked to exempt in-state wineries—but not their out-of-state competitors—from distributing their wines through wholesalers. *Id.* Because the effect of these exemptions from the three-tier system was to lower the price of in-state wine relative to out-of-state wine, the Court determined that "[t]he differential treatment between in-state and out-of-state wineries constitutes explicit discrimination against interstate commerce." *Id.* at 467.

The Court then traced the history of the Twenty-first Amendment and the cases interpreting it to determine whether § 2 "saved" the laws from constitutional infirmity. *Id.* at 489. In so doing, the Court observed that "the Twenty-first Amendment does not supersede other provisions of the Constitution and, in particular, does not displace the rule that States may not give a discriminatory preference to their own producers." *Id.* at 486. Section 2 did not save these

-8-

exemptions, then, because they amounted to "straightforward attempts to discriminate in favor of local producers." *Id.* at 489. *Granholm* thus applied to laws governing the structure of the producer tier of the three-tier system "the nondiscrimination principle of the Commerce Clause," *id.* at 487, which the Court's post-*Hostetter* cases had applied to liquor regulations other than those defining a State's liquor distribution system. *See, e.g.*, *Healy v. Beer Inst.*, 491 U.S. 324, 342 (1989) (striking down a "price-affirmation statute" under the Commerce Clause, because "those laws have the practical effect of regulating liquor sales in other States"); *324 Liquor Corp.*, 479 U.S. at 337-38, 347 (resale pricing system); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 585 (1986) (price-affirmation statute); *Bacchus*, 468 U.S. at 276 (protectionist tax); *Capital Cities Cable*, 467 U.S. at 714-16 (alcohol-advertisement regulation); *Midcal*, 445 U.S. at 99, 110 ("price maintenance and price posting statutes").

But the Court in *Granholm* also took care to note that its holding did not "call into question the constitutionality of the three-tier system." 544 U.S. at 488. Indeed, the Court described the three-tier system as "unquestionably legitimate," *id.* at 489 (internal quotation omitted), referring specifically to the "in-state wholesaler" as an element of that system. *Id.* (quoting *North Dakota*, 495 U.S. at 447 (Scalia, J., concurring in the judgment)). The Court explained: "The aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods." *Id.* at 484-85. So the discriminatory laws at issue in *Granholm* were unconstitutional, but "States can mandate a three-tier distribution scheme in the exercise of their authority under the Twenty-first Amendment," *id.* at 466, and "[s]tate policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Id.* at 489.

III.

A.

The question presented by this appeal is whether the residency requirement applicable to the wholesale tier of Missouri's liquor distribution system, which is otherwise impermissible under Commerce Clause jurisprudence, is authorized by § 2 of the Twenty-first Amendment.

Southern Wine first argues that the residency requirement is invalid under the Court's rationale in *Bacchus*. According to Southern Wine, the legislative purpose of the residency requirement was "mere economic protectionism." *Bacchus*, 468 U.S. at 276. Southern Wine contends that this singular purpose may be gleaned from a contemporaneous newspaper article that purports to describe statements made "in the assembly" by one of the legislation's four sponsors. This article reported that M.C. Matthes, then the president pro tem of the state senate (and later a judge of this court, *see, e.g.*, *Aaron v. Cooper*, 257 F.2d 33 (8th Cir.) (Matthes, J.), *aff'd sub nom. Cooper v. Aaron*, 358 U.S. 1 (1958)), said the law "was intended to prevent a few big national distillers from monopolizing the wholesale liquor business in Missouri."

Southern Wine argues that this news report demonstrates Missouri's "clear protectionist motive," and that liquor regulations motivated by such protectionist intent are unconstitutional, because they violate a central tenet of the Commerce Clause and are not supported by any clear concern of the Twenty-first Amendment. *Bacchus* established that a showing of discriminatory purpose "is sufficient to demonstrate the State's lack of entitlement to a more flexible approach permitting inquiry into the balance between local benefits and the burden on interstate commerce." 468 U.S. at 270. So Southern Wine attempts to sail under the *Bacchus* flag, contending that the legislative history supplied by this newspaper report "dooms" the residency requirement.

-10-

*Bacchus* considered a protectionist tax exemption, not a regulation of the three-tier distribution system. *Granholm*, however, considered the *Bacchus* rationale "fatal" to the States' position in a case that involved regulations of the producer tier of the three-tier system, 544 U.S. at 488, while at the same time declaring that "[s]tate policies are protected under the Twenty-first amendment when they treat liquor produced out of state the same as its domestic equivalent." *Id*. at 489. Assuming that *Bacchus*'s analysis of economic protectionism should apply to a regulation of the wholesale tier that does not discriminate against out-of-state liquor, Southern Wine's position based on the newspaper article and alleged protectionist intent is nonetheless unpersuasive.

First, Southern Wine did not raise this protectionist-intent argument in the district court, enter the newspaper article into the record, or even cite *Bacchus* in their briefs on summary judgment. *See* R. Docs. 34, 42, 48. The State thus had no occasion to present evidence regarding the legislature's motivation, and the district court made no findings. Because the argument was not raised in the district court, Southern Wine has waived it. *See St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.*, 539 F.3d 809, 824 (8th Cir. 2008).

Second, insofar as we have discretion to consider Southern Wine's contention for the first time on appeal, we are not inclined to do so where the only evidence offered is a newspaper article. Newspaper articles are "rank hearsay," *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010); *Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 147 (8th Cir. 1991), and they thus provide a doubtful basis for an important judgment about the constitutionality of legislation. Although courts have mentioned news reports in the course of discussing legislative purpose, *e.g.*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 206 n.22 (1996), we decline to rest a constitutional determination on a news article that does not even purport to provide direct quotations from the one legislator cited.

-11-

Third, assuming the article accurately describes Senator Matthes's remarks, those statements represent only a single legislator's views about the purpose of the residency requirement. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). While a legislative sponsor's statements to the general assembly may be entitled to greater weight than the statements of other legislators in certain situations, *see Corley v. United States*, 556 U.S. 303, 318 (2009), there is not a sufficient basis in this case to impute the reported statements to the entire legislature and the governor.

Fourth, even assuming that Senator Matthes's statements represented the views of the legislature, they do not establish the sort of protectionist intent that was conceded by the State in *Bacchus*. According to the newspaper article, Senator Matthes said that the residency requirement was "intended to prevent a few big national distillers from monopolizing the wholesale liquor business in Missouri." But the legislature may have sought to prevent monopolization by out-of-state wholesalers and to encourage the use of in-state wholesalers for legitimate reasons, such as to promote social responsibility and public accountability among liquor wholesalers or to facilitate law enforcement.[4]

Finally, the chapter of the Missouri Code containing the residency requirement includes a "purpose clause," which provides the stated purposes of the provisions

---

[4] Amicus American Beverage Licensees, citing other newspaper articles, suggests that the Missouri residency requirement was enacted in 1947 "in response to a particular circumstance, which was not that of out-of-state competition *per se*, but a threat to the state's three-tier distribution system," namely, that a national distillery was attempting to distribute its own alcohol in Missouri and elsewhere through a wholly-owned subsidiary. *See State ex rel. Cont'l Distilling Sales Co. v. Vocelle*, 27 So.2d 728 (Fla. 1946).

within that chapter: "to promote responsible consumption, combat illegal underage drinking, and achieve other important state policy goals such as maintaining an orderly marketplace composed of state-licensed alcohol producers, importers, distributors, and retailers." Mo. Rev. Stat. § 311.015. Southern Wine argues that this provision "sheds no light" on the purposes of the residency requirement because (1) it applies to the entire chapter rather than just the residency requirement, and (2) it was enacted in 2007, sixty years after the residency requirement was adopted. We are not convinced by either contention. Whether or not the "purpose clause" applies to more statutory provisions than the residency requirement, it applies to that requirement all the same. And Southern Wine offers no support for the proposition that a later legislature—considering a preexisting law useful but perhaps for different reasons than its predecessor—cannot supplant an earlier legislature's intended purpose by enacting an express statutory purpose provision.

For these reasons, Southern Wine has not shown that the residency requirement is unconstitutional on the ground that it was motivated by mere economic protectionism.

B.

Whether Missouri's wholesaler residency requirement is constitutional thus depends on the current state of the relationship between the dormant Commerce Clause and the Twenty-first Amendment. In at least some cases, the proper inquiry in a Commerce Clause challenge to a state liquor regulation asks "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Bacchus*, 468 U.S. at 275-76 (internal quotation omitted). But in its most recent pronouncement on the subject, the Supreme Court simultaneously cited *Bacchus* and said that "[s]tate policies are protected under the Twenty-first Amendment when they treat liquor

-13-

produced out of state the same as its domestic equivalent." *Granholm*, 544 U.S. at 489.

Given *Granholm*'s recency and specificity, we think the Court's discussion there provides the best guidance. The three-tier system is "unquestionably legitimate," *Granholm*, 544 U.S. at 489 (internal quotation omitted), and that system includes the "licensed in-state wholesaler." *Id.* (quoting *North Dakota*, 495 U.S. at 447 (Scalia, J., concurring in the judgment)). More broadly, state policies that define the structure of the liquor distribution system while giving equal treatment to in-state and out-of-state liquor products and producers are "protected under the Twenty-first Amendment." *Id.* Viewed in context, the Court's statement must mean that such policies are "protected" against constitutional challenges based on the Commerce Clause.

This court has shared the First Circuit's view that "federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement." *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991); *see Fond du Lac Band of Lake Superior Chippewa v. Frans*, 649 F.3d 849, 852 (8th Cir. 2011). Here, the Court's most recent decision on the Twenty-first Amendment dedicated a paragraph to delimiting *Granholm*'s rationale, in an area where the Court's jurisprudence has been characterized by a case-by-case balancing of interests that defies ready predictability. The prudent course for an inferior court in this circumstance is to hew closely to the Court's specific, contemporary guidance. *See Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 200-01 (2d Cir. 2009) (Calabresi, J., concurring) ("[T]he best that we can do is to look to the bulk of cases decided by the Supreme Court and read with special care its latest decision—at the moment, *Granholm*.").

*Granholm*'s guidance applies readily to the residency requirement at issue in this case. The residency requirement defines the extent of in-state presence required to qualify as a wholesaler in the three-tier system. *See* Mo. Rev. Stat. § 311.060.3. The rule does not discriminate against out-of-state liquor products or producers. If it is beyond question that States may require wholesalers to be "in-state" without running afoul of the Commerce Clause, *Granholm*, 544 U.S. at 489 (internal quotation omitted), then we think States have flexibility to define the requisite degree of "in-state" presence to include the in-state residence of wholesalers' directors and officers, and a super-majority of their shareholders. Southern Wine says the State has no good reason to require in-state residency of these actors: wholesalers do not pay excise taxes; any corporation doing business in Missouri under a license is within the reach of the State's enforcement arm; and the social responsibility of wholesalers is irrelevant because they do not sell alcohol directly to the public. But these arguments prove too much, for the same could be said about why it is unnecessary for a wholesaler to have even a warehouse and registered agent in Missouri. Yet we know from *Granholm* that the States may require "licensed in-state wholesaler[s]," 544 U.S. at 489 (internal quotation omitted), notwithstanding what Southern Wine views as attenuated state interests.

Southern Wine contends that even after *Granholm*, the constitutionality of residency requirements in the wholesale tier depends on a case-specific balancing of interests under the Commerce Clause and the Twenty-first Amendment. Insofar as *Granholm* imported a balancing approach to regulations of the three-tier system, however, it drew a bright line between the producer tier and the rest of the system. The more natural reading of *Granholm* is the Second Circuit's: "Because New York's three-tier system treats in-state and out-of-state liquor the same, and does not discriminate against out-of-state products or producers, we need not analyze the regulation further under Commerce Clause principles." *Arnold's Wine*s, 571 F.3d at 191.

Southern Wine argues, however, that state policies are "protected" by the Twenty-first Amendment only if they concern "inherent" or "integral" aspects of the three-tier system, and that a residency requirement for wholesalers does not qualify. We find these modifiers unhelpful. There is no archetypal three-tier system from which the "integral" or "inherent" elements of that system may be gleaned. States have discretion to establish their own versions of the three-tier system, and *Granholm* itself announced the unquestionable legitimacy of the three-tier system in a case involving two different versions of that system from New York and Michigan. *See Granholm*, 544 U.S. at 468-70. Even if *Granholm sub silentio* meant to protect only the "inherent" or "integral" aspects of the three-tier system, whatever they might be, the Court cited the "in-state wholesaler" in connection with the very sentence affirming that "the three-tier system itself is unquestionably legitimate." *Id.* at 489 (internal quotations omitted). In-state wholesalers, therefore, must be "integral" to the three-tier system under *Granholm*. *Cf. Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006) (opinion of Niemeyer, J.) ("[A]n argument that compares the status of an in-state retailer with an out-of-state retailer—or that compares the status of any other in-state entity under the three-tier system with its out-of-state counterpart—is nothing different than an argument challenging the three-tier system itself. . . . [T]his argument is foreclosed by the Twenty-first Amendment and the Supreme Court's decision in *Granholm*[.]").

If, despite the "protected" status promised by *Granholm*, state policies defining the three-tier system are subject to deferential scrutiny, Missouri's law passes muster. The legislature legitimately could believe that a wholesaler governed predominantly by Missouri residents is more apt to be socially responsible and to promote temperance, because the officers, directors, and owners are residents of the community and thus subject to negative externalities—drunk driving, domestic abuse, underage drinking—that liquor distribution may produce. Missouri residents, the legislature sensibly could suppose, are more likely to respond to concerns of the community, as expressed by their friends and neighbors whom they encounter day-to-

day in ballparks, churches, and service clubs. The legislature logically could conclude that in-state residency facilitates law enforcement against wholesalers, because it is easier to pursue in-state owners, directors, and officers than to enforce against their out-of-state counterparts. The residency requirement is not so attenuated as Southern Wine's hypothetical rule that all officers, directors, and shareholders of a wholesaler must be *born* in Missouri. *Cf.* U.S. Const. Art. II, § 1, cl. 5.

Southern Wine maintains that the State's assertion of legitimate interests is undermined by the deposition testimony of a deputy state supervisor for the Division, who was designated to testify on behalf of the Division pursuant to Federal Rule of Civil Procedure 30(b)(6). The deputy supervisor testified that he did not "think" that the residency rule "impacts the distribution system," because "we have a three-tier system of distribution," and residency "doesn't affect the distribution." When asked, "But this lawsuit doesn't erode the three-tier system, does it?" he answered, "No." The witness elaborated that he did not see a court order to license Southern Missouri "as doing anything," because the State already licensed one non-resident corporation under a grandfather provision. He added that wholesalers have "little impact upon" the "direct sale" of alcohol to minors, and that he could not "think of any" relationship between the residency requirement and the safety of Missouri citizens. Southern Wine also relies upon the grandfather clause in the residency statute, arguing that the existence of a non-resident wholesaler licensed under that clause undercuts the Division's asserted rationales.

It is fair to say that the deputy state supervisor did not mount the most vigorous defense of Missouri's law; M.C. Matthes may well have done better. But this official's testimony was not as devastating to the Division's cause as Southern Wine suggests. The witness did not disclaim the possibility that Missouri's residency requirement furthers some of the interests asserted by the State in defending the law. He couched several responses in terms of his own knowledge and thoughts about the matter. He addressed some questions that were directed at the impact of licensing

-17-

Southern Missouri alone, not at the effects of licensing an unlimited number of out-of-state wholesalers. *Cf. Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981). Other answers do not really refute the Division's position: there is no contention by the State that wholesalers are involved in "direct sale" of alcohol to minors, or that the residency status of wholesalers affects whether the distribution system has three tiers. A 30(b)(6) witness's legal conclusions are not binding on the party who designated him, *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009), and a designee's testimony likely does not bind a State in the sense of a judicial admission. *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001). But even assuming the Division conceded certain points through its witness's testimony, the deputy supervisor also offered support for the Division's asserted interest in ensuring community responsibility: "Some wholesalers do get involved in community action committees and things like that. So some of them do get involved in anti-drinking campaigns with various coalitions." J.A. 67. And he testified that the requirement "may serve" the State's interest in promoting temperance, just "not as much as it used to." *Id*. at 68.[5]

Likewise, the existence of a grandfather clause and one non-resident wholesaler in Missouri does not doom the statute. Exceptions like grandfather clauses do not, in and of themselves, demonstrate the invalidity of rules from which they are carved. Missouri's legislature in 1947 reasonably could have chosen to address incrementally the perceived ills targeted by the residency requirement, and to accommodate preexisting business interests while keeping the floodgates closed. The deputy supervisor testified that sometimes dealing with the grandfathered nonresident wholesaler "is difficult;" but even the absence of negative effects from

---

[5]The deputy state supervisor also testified that nonresident status of a wholesaler caused a "problem" with "assurance of excise tax collection," because "if they have 32 states they're licensed in . . . things could . . . move across state borders very easily without . . . us being able to detect whether or not . . . the excise taxes were paid." J.A. 63, 79.

-18-

a single nonresident wholesaler does not preclude a judgment by the State that unlimited nonresident wholesalers would still pose a threat to legitimate state interests. There is no narrow tailoring requirement under the Twenty-first Amendment, and the residency requirement is not invalid because the legislature might have gone further than it did. *Cf. Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 467-68 (1981); *City of New Orleans v. Dukes*, 427 U.S. 297, 305 (1976).

Southern Wine urges us to follow the Fifth Circuit's decision in *Cooper v. McBeath*, 11 F.3d 547 (5th Cir. 1994), which invalidated a Texas residency requirement for certain liquor permits. *Id.* at 555-56. But *Cooper* pre-dated *Granholm*, and its placement of a "towering" burden on a State, *id.* at 553, to justify a three-tier regulation that does not discriminate against out-of-state products or producers, cannot be reconciled with the deference demanded by *Granholm*'s considered *dicta*. The Fifth Circuit's cryptic statement about *Cooper* in *Wine Country Gift Baskets.com v. Steen*, 612 F.3d 809, 821 (5th Cir. 2010), does not enlighten us about that court's present view. *Wine Country* did not involve a residency requirement on appeal, *id.* at 813, and the court had no need to address the continuing vitality of *Cooper*.

The Division has established a sufficient basis for its residency requirement, which is meaningfully tied to the "aim of the Twenty-first Amendment . . . to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use." *Granholm*, 544 U.S. at 484. For similar reasons, the requirement has a rational basis and does not deprive Southern Wine of equal protection of the laws under the Fourteenth Amendment. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993).[6]

---

[6]Southern Wine emphasized at oral argument that even if *some* residency requirements may be constitutional, Missouri's *durational* residency requirement of three years does not advance any legitimate purpose. *See* Mo. Rev. Stat. § 311.060.3. This argument was not developed in the district court or the opening brief on appeal,

\* \* \*

The judgment of the district court is affirmed.

_____

and it is therefore waived. *See Rotskoff v. Cooley*, 438 F.3d 852, 854 (8th Cir. 2006); *St. Paul Fire & Marine*, 539 F.3d at 824. In any event, a declaration that Missouri may require officers, directors, and a super-majority of shareholders of wholesalers to demonstrate current residency, but not three-year residency, would not redress Southern Wine's alleged injury, because Southern Wine does not claim to be a current resident within the meaning of the statute.