SUTTON, Circuit Judge, concurring in part and dissenting in part.
Tennessee requires sellers of alcohol to have a retail license. To obtain a license, the applicant, including any officers and directors, must be "a bona fide resident of th[e] state during the two-year period immediately preceding" the application. Tenn. Code Ann. §§ 57-3-204(b)(2)(A), (b)(3)(A). The licensing requirement applies to all sales of alcohol in the State, whether the alcohol was produced in Tennessee or elsewhere. I would uphold these modest requirements, as the text of the Twenty-first Amendment, the original understanding of that provision's relationship to the Commerce Clause, modern U.S. Supreme Court precedent, and a recent Eighth Circuit decision (concerning a similar Missouri residency requirement) all *629 support their validity. The majority viewing it differently, I respectfully dissent from this part of its decision and agree with its other conclusions.
Constitutional text . The language of the pertinent constitutional provisions supports Tennessee's right to impose this requirement. At the outset, the U.S. Constitution gave Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3, and impliedly prohibited States from doing the same, see Albert Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment , 25 Minn. L. Rev. 432, 485 (1941); 2 The Records of the Federal Convention of 1787, at 625 (Max Farrand ed. 1966) (James Madison grew "more & more convinced" that the regulation of commerce among the States "was in its nature indivisible and ought to be wholly under one authority."). Whatever else this Tennessee requirement does, it does not purport to displace or contradict congressional regulation of commerce among the States. It merely announces a limited requirement for in-state sales of alcohol.
The end of Prohibition in 1933 made the States' authority over this issue more clear. In repealing the Eighteenth Amendment, the Twenty-first Amendment allowed the States to regulate alcohol as a unique commercial article. Unlike any other provision in the U.S. Constitution, it sets up what is largely a regulatory regime of one: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof , is hereby prohibited." U.S. Const. amend. XXI, § 2 (emphasis added). After 1933, then, a State could continue to prohibit sales of alcohol within its territory. Ziffrin, Inc. v. Reeves , 308 U.S. 132, 138, 60 S.Ct. 163, 84 L.Ed. 128 (1939). Or it could allow sales of alcohol on its own commercial terms, say by permitting only some types of alcohol to be sold within the State or by permitting sales only through state-run retailers or by permitting sales only through some other distribution system. The language of the amendment-prohibiting the "delivery or use" of alcohol "in violation of the laws" of each State-empowers States to regulate sales of alcohol within their borders. A two-year residency requirement to obtain a license to own a brick-and-mortar retail store, like a two-year residency requirement to operate a state-owned retail store, fits within the core authority delegated to the States by the Twenty-first Amendment.
History . A few screen shots of history support this interpretation. The itinerant regulation of alcohol over time captures the itinerant relationship between the power of the National Government and the States over time. Most areas of federal and state authority, including over commerce, initially were deemed largely exclusive, as a review of the enumerated powers delegated to Congress in Article I, Section 8 suggests. If Congress had authority over a form of commerce, the States usually did not. So too in the other direction. See Gibbons v. Ogden , 22 U.S. (9 Wheat.) 1, 187-89, 197-200, 6 L.Ed. 23 (1824) ; id. at 226-27 (Johnson, J., concurring); see also Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue , 483 U.S. 232, 260, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) (Scalia, J., concurring in part and dissenting in part) ("The pre-emption of state legislation would automatically follow, of course, if the grant of power to Congress to regulate interstate commerce were exclusive ... as John Marshall at one point seemed to believe it was."). Largely exclusive spheres of authority, not largely overlapping spheres *630 of authority, thus were the initial order of the day.
But the congressional sphere of authority grew over time, as more and more "commerce" was treated as "among the several States." Even before Prohibition in 1920, the definition of interstate commerce had come to mean that the regulation of most products, including alcohol, was increasingly a matter of state and federal law. See, e.g. , Leisy v. Hardin , 135 U.S. 100, 121-23, 10 S.Ct. 681, 34 L.Ed. 128 (1890). That helps to explain the federal laws concerning sales of alcohol before Prohibition. Although the Supreme Court had held that the States could "regulat[e] and restrain[ ] the traffic" in liquor, including by "prohibiting it altogether," The License Cases , 46 U.S. (5 How.) 504, 577, 12 L.Ed. 256 (1847), it also held that they could not interfere with the liquor traffic "in the absence of congressional permission to do so," Leisy , 135 U.S. at 118, 124-25, 10 S.Ct. 681. Those rulings spawned a series of congressional attempts to bolster state authority. See Wilson Act of 1890, 27 U.S.C. § 121 ; Webb-Kenyon Act of 1913, 27 U.S.C. § 122. They were largely unsuccessful. One reason was that the Court held that the Commerce Clause prohibited a dry State from regulating unopened packages of alcohol-even though destined for illegal consumption in the State-because unopened packages remained articles of commerce. Rhodes v. Iowa , 170 U.S. 412, 426, 18 S.Ct. 664, 42 L.Ed. 1088 (1898).
This federal-state interplay also helps to explain the language of the Eighteenth Amendment, which first established that "the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited." U.S. Const. amend. XVIII, § 1. Section 2 of the Amendment then clarified overlapping federal and state authority to enforce Prohibition: "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."
With the passage of the Twenty-first Amendment, the States and Federal Government both had some regulatory power over alcohol but generally were thought to regulate it exclusively in different ways. Compare Indianapolis Brewing Co. v. Liquor Control Comm'n , 305 U.S. 391, 394, 59 S.Ct. 254, 83 L.Ed. 243 (1939) (upholding Michigan statute prohibiting the sale of out-of-state beer against Commerce Clause challenge), with William Jameson Co., Inc. v. Morgenthau , 307 U.S. 171, 172-73, 59 S.Ct. 804, 83 L.Ed. 1189 (1939) (per curiam) (upholding Federal Alcohol Administration Act's labeling requirements against Twenty-first Amendment challenge). From the vista of 1933, a lawyer (and judge) would have presumed that the regulation of sales of alcohol within the State (such as a residency requirement for ownership of a retail liquor store) would be an exclusive state power given the existing paradigm of largely separate and exclusive spheres of regulatory power.
But over the next ten years, the Court's understanding of the Commerce Clause power changed. By the early 1940s, it was no longer true that regulations of commerce in the main were exclusively federal or exclusively state. The growth of the national commerce power, through the development of the "substantial effects" test, Wickard v. Filburn , 317 U.S. 111, 128-29, 63 S.Ct. 82, 87 L.Ed. 122 (1942), eliminated many (but not all) distinctions between intrastate and interstate commerce, making most businesses potentially subject to state and national regulation. The question was no longer "whether the right government was acting within the right sphere."
*631 Am. Beverage Ass'n v. Snyder , 735 F.3d 362, 377 (6th Cir. 2013) (Sutton, J., concurring) (quoting Ernest A. Young, "The Ordinary Diet of the Law": The Presumption Against Preemption in the Roberts Court , 2011 Sup. Ct. Rev. 253, 257 ).
That development altered the nature of the implied restrictions on state authority established by the Commerce Clause. An exclusive delegation of power to one sovereign implies a ban on assertions of power by another sovereign over the same matter. Just as Congress's exclusive power to "coin Money" implied a lack of state authority to do the same, U.S. Const. art. I, § 8, cl. 5, Congress's exclusive power to regulate interstate commerce among the States implied a lack of state power in the area. See Smith v. Turner , 48 U.S. (7 How.) 283, 393-96, 12 L.Ed. 702 (1849) (McLean, J.); The Federalist No. 42, at 263 (James Madison) (Clinton Rossiter ed. 2003); but see Tyler Pipe , 483 U.S. at 261, 107 S.Ct. 2810 (Scalia, J., concurring in part and dissenting in part). Hence the need for the Court to create implied/negative/dormant Commerce Clause limitations on state authority, which was the only way to preserve the Federal Government's largely exclusive regulatory power over interstate commerce.
At their creation, the Court's dormant Commerce Clause cases were not just appropriate but necessary, as they provided the only way to keep the States on the one hand and Congress on the other in their separate and exclusive spheres of regulatory authority. But in a post-1930s world, in which the National Government and States largely have overlapping power over most sectors of commerce, the implementation of an implied restriction on state authority is much more difficult to articulate and police.
Which is what makes this case interesting-and complicated. From the vantage point of the understanding of the Commerce Clause circa 1933, the case looks easy. That's why Justice Brandeis in 1936 would describe the States' authority to regulate sales of alcohol in such sweeping terms:
The words used [in § 2] are apt to confer upon the State the power to forbid all importations which do not comply with the conditions which it prescribes. The plaintiffs ask us to limit this broad command. They request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it.
State Bd. of Equalization v. Young's Mkt. Co. , 299 U.S. 59, 62, 57 S.Ct. 77, 81 L.Ed. 38 (1936). In the Court's view at that point, the Twenty-first Amendment gave the States what looked like largely plenary commercial authority (save for violations of individual rights guarantees, such as the Fourteenth Amendment) to regulate sales of alcohol within their borders, including in ways that the Commerce Clause would not otherwise allow. Id.
The congressional stance on regulation of alcohol at the time suggests a similar understanding. In the immediate aftermath of the Twenty-first Amendment's ratification, Congress overhauled Title 27 of the U.S. Code-"Intoxicating Liquors"-by repealing Chapters 1, 2, 4, 5, and 9 (dealing with production, transportation, and sale of liquor). 27 U.S.C. §§ 1 - 108, 221 - 28. Chapter 6, which includes the Wilson Act of 1890 ( § 121 ), Webb-Kenyon Act of 1913 ( § 122 ), and, many years later, the Twenty-first Amendment Enforcement *632 Act of 2000 (§ 122a), all bolster state authority over alcohol. See, e.g. , id. § 122a(b)-(c) (authorizing state Attorneys General to bring civil actions in federal court to enjoin "any act that would constitute a violation of a State law regulating the importation or transportation of any intoxicating liquor"). Chapter 8, the last enclave of federal oversight, concerns things like labeling. Federal Alcohol Administration Act, 27 U.S.C. §§ 201 et seq. But it leaves "transportation [and] importation ... for delivery or use" (i.e., distribution) to the States, U.S. Const. amend. XXI, § 2, and even incorporates state-law requirements, like Tennessee's two-year residency rule for officers and directors, see 27 U.S.C. §§ 204(a)(2)(C), 204(d), 208(b)(2).
At the time the Twenty-first Amendment was ratified, a State's greater authority to ban all alcohol sales in the State included a lesser authority to regulate sales of alcohol in the State with a heavy hand. Ziffrin , 308 U.S. at 138, 60 S.Ct. 163. Another way of putting it is this: The existence of the Commerce Clause and the Twenty-first Amendment makes it more difficult to imply a restriction on state authority (to regulate commerce) expressly created in another constitutional provision (to regulate retail sales of alcohol).
Modern U.S. Supreme Court precedent. The Court's more recent decisions in this area should be read against this backdrop, and are easier to follow (to my mind) in that context. Even if the meaning of the relevant constitutional provisions has migrated over the years, perhaps to account for the continued integration of domestic and international commerce, today's precedents still give the States authority to impose residency requirements on the owners of retail establishments that sell beer, wine, or liquor.
A consensus remains that the Twenty-first Amendment "created an exception to the normal operation of the Commerce Clause." Capital Cities Cable, Inc. v. Crisp , 467 U.S. 691, 712, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). While the size of that exception may be fickle, a few constant rules remain. On one side of the ledger, the Commerce Clause still limits state efforts to regulate activity outside of a State's territorial domain. See, e.g. , Healy v. Beer Inst. , 491 U.S. 324, 343, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (invalidating price-affirmation statute regulating liquor sales in other States); Bacchus Imps., Ltd. v. Dias , 468 U.S. 263, 273, 276, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (invalidating discriminatory tax on out-of-state liquor); Capital Cities , 467 U.S. at 714, 104 S.Ct. 2694 (invalidating ban on TV wine ads emanating from other States); Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc. , 445 U.S. 97, 114, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (invalidating resale price maintenance and price posting statutes); Hostetter v. Idlewild Bon Voyage Liquor Corp. , 377 U.S. 324, 331-32, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964) (invalidating regulation of alcohol passing through JFK Airport that would not be used until arrival at international destination); Collins v. Yosemite Park & Curry Co. , 304 U.S. 518, 533-34, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938) (invalidating state restriction on shipments to a federal enclave in its borders).
On the other side of the ledger, exceptions to the normal operation of the Commerce Clause remain alive and well in some areas-in particular the in-state nature of alcohol distribution. The States retain "virtually complete control" over "how to structure the[ir] liquor distribution system[s]." Granholm v. Heald , 544 U.S. 460, 488, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005). All thus agree that the States retain authority (1) to ban alcohol completely, *633 (2) to distribute liquor exclusively through state-run monopolies, or (3) to operate distribution systems, including through regulations that require retailers and wholesalers to reside in-state. Id. at 489, 125 S.Ct. 1885. Because liquor distribution implicates the States' core interests after the repeal of Prohibition, such regulations are generally "protected under [§ 2] when they treat liquor produced out of state the same as its domestic equivalent." Id. State authority in this area is "virtually" limitless, at least when it comes to the Commerce Clause. Id. at 488, 125 S.Ct. 1885. State regulations of in-state distribution, even if facially discriminatory, are constitutional unless a challenger can show that they serve no purpose besides "economic protectionism." Bacchus , 468 U.S. at 276, 104 S.Ct. 3049.
Measured by these standards and cases, Tennessee's two-year residency requirement should survive. We must start with the assumption that tiered distribution systems are "unquestionably legitimate." Granholm , 544 U.S. at 489, 125 S.Ct. 1885. As part of these systems, the States may require retailers and wholesalers to reside within their borders. See id. And if the States may do that, they must "have flexibility to define the requisite degree of 'in-state' presence" necessary for participating as a retailer or wholesaler. S. Wine & Spirits v. Div. of Alcohol & Tobacco Control , 731 F.3d 799, 810 (8th Cir. 2013). Tennessee's two-year residency rule and its application of that rule to a retailer's officers and directors lawfully exercise that authority.
Promoting responsible consumption and orderly liquor markets "fall within the core of [Tennessee's] power" under § 2. North Dakota v. United States , 495 U.S. 423, 432, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990). Retailers are critical to serving those interests. Because they form the final link in the distribution chain, retailers are closest to the local risks that come with selling alcohol, such as "drunk driving, domestic abuse, [and] underage drinking." S. Wine & Spirits , 731 F.3d at 811. Tennessee reasonably concluded that requiring retailers to reside in the communities that they serve would further "health, safety and welfare." Tenn. Code Ann. § 57-3-204(b)(4). Tennessee's method for establishing in-state residency also makes sense. Requiring individual retailers to reside in one place for a sustained, two-year period ensures that they will be knowledgeable about the community's needs and committed to its welfare. The only way to know a community is to live there, which may explain why Congress requires federal court of appeals judges to live within their circuits, 28 U.S.C. § 44(c), and district court judges to live within their districts, id. § 134(b).
The same is true with respect to a residency requirement for officers and directors of the retailer. It ensures that they are familiar with the community and in a position to alter or influence the retailer's behavior based on that understanding. See Tenn. Code Ann. §§ 48-18-101(b), 301(b)(1), 402, 403(b)(1). The Federal Alcohol Administration Act, notably, also regulates officers and directors of liquor companies. See, e.g. , 27 U.S.C. § 208.
Court of appeals precedents. The post- Granholm circuit precedents likewise support this conclusion. Several courts agree that Granholm drew a line between regulation of (out-of-state) producers and regulation of (in-state) wholesalers and retailers, requiring rigorous review of the former and deferential review of the latter. See Freeman v. Corzine , 629 F.3d 146, 158 (3d Cir. 2010) ; Arnold's Wines, Inc. v. Boyle , 571 F.3d 185, 189 (2d Cir. 2009) ; Brooks v. Vassar , 462 F.3d 341, 352 (4th Cir. 2006) ; cf.
*634 Cooper v. Tex. Alcoholic Beverage Comm'n (Cooper II ), 820 F.3d 730, 743 (5th Cir. 2016) (dormant Commerce Clause applies "to a lesser extent when the regulations concern the retailer or wholesaler tier as distinguished from the producer tier").
One circuit has approved requirements nearly identical to Tennessee's. In a thoughtful opinion by Judge Colloton, the Eighth Circuit upheld a three-year residency requirement in Missouri for wholesalers' officers, directors, and 60% of their stockholders. S. Wine & Spirits , 731 F.3d at 802-03. We should do the same for Tennessee's two-year requirement.
Jelovsek v. Bredesen , 545 F.3d 431 (6th Cir. 2008), does not change things. That case, it is true, invalidated a law that "requir[ed] a two-year Tennessee residency." Id. at 438. But the requirement applied only to wine production . See Grape and Wine Law, Tenn. Code Ann. § 57-3-207 (regulating "winer[ies]" and "farm wine producer[s]"). It thus did not "treat liquor produced out of state the same as its domestic equivalent." Granholm , 544 U.S. at 489, 125 S.Ct. 1885 (emphasis added). State laws that do treat out-of-state products the same, like Tennessee's retail residency rules, are generally "protected under the Twenty-first Amendment." Id.
Isn't it still true that the requirements here are "discriminatory on their face," just like the ones in Jelovsek ? But in-state distribution regulations in one sense always discriminate against out-of-state interests, as Granholm illustrates. See 544 U.S. at 466, 489, 125 S.Ct. 1885 ; id. at 517-19, 521-22, 125 S.Ct. 1885 (Thomas, J., dissenting). At the same time, however, such regulations may serve a State's core concerns under the Twenty-first Amendment-for instance, by reducing in-state supply, increasing the price of liquor, or even regulating it in a way that increases (or limits decreases in) the price of liquor. Cf. 44 Liquormart, Inc. v. Rhode Island , 517 U.S. 484, 504-05, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). It thus does not matter whether an in-state distribution regulation discriminates against out-of-state interests. What matters is what type of discrimination is permissible . This one is, and Jelovsek says nothing about that question.
The Fifth Circuit, I acknowledge, refused to enforce a residency requirement for holders of a "mixed beverage permit" and 51% of their stockholders. Cooper II , 820 F.3d at 734-35 ; see Tex. Alcoholic Bev. Code Ann. § 28.01. In Cooper II , the Texas Package Stores Association asked the court to grant relief from a twenty-five-year-old injunction that allowed a Texas strip club to retain its permit after it was acquired by owners living in Florida and Tennessee. See Fed. R. Civ. P. 60(b)(5). The Fifth Circuit denied relief because Granholm did not effect "a significant change in decisional law." Cooper II , 820 F.3d at 740-41.
Putting this unusual posture to the side, the Fifth Circuit appears to have misread Granholm when it concluded that "[d]istinctions between in-state and out-of-state retailers and wholesalers are permissible only if they are an inherent aspect of" a State's distribution system. Id. at 743. Because "[t]here is no archetypal three-tier system from which [to glean] the 'integral' or 'inherent' elements," the Fifth Circuit's test creates the risk that a court will unnecessarily substitute its own judgment for that of a state legislature about the best policies for regulating liquor. S. Wine & Spirits , 731 F.3d at 810. Granholm did more than authorize States to maintain some sort of liquor distribution system; it gave them "virtually complete control" over "how to structure th[at] ... system." Granholm , 544 U.S. at 488, 125 S.Ct. 1885. It matters not that one can imagine other *635 ways a distribution system could function because "[t]here is no narrow tailoring requirement under the Twenty-first Amendment." S. Wine & Spirits , 731 F.3d at 812.
I agree with my colleagues, however, that two aspects of Tennessee's scheme must fall: its application of the residency requirement to 100% of a retailer's stockholders, Tenn. Code Ann. § 57-3-204(b)(3)(A), (B), (D), and its imposition of a ten-year residency requirement for renewal of a license, id. § 57-3-204(b)(2)(A).
A requirement that every stockholder reside in Tennessee does not further the State's interest in responsible retailers. Tennessee's Business Corporations Act states that company management-directors and officers-shall exercise "[a]ll corporate powers." Id. §§ 48-18-101(b), 402; see also id. § 48-18-101(c). While stockholders still may exert influence over their agents, 51% of the stockholders-not 100%-is usually all it takes to do so. Unlike Missouri, Tennessee did not focus on closely held corporations or require a simple- or super-majority of stockholders to be residents. See S. Wine & Spirits , 731 F.3d at 802-03 (citing Mo. Rev. Stat. § 311.060.3 ). I see no way to explain this all-or-nothing-at-all stockholder requirement as doing anything other than promoting economic protectionism.
The same goes for Tennessee's residency rule for renewal of a license. Although Tennessee grants an initial retail license after two years of in-state residence, it grants renewal of that very license only after ten years of residence. Tenn. Code Ann. § 57-3-204(b)(2)(A). Tennessee offered no reason why a person who has resided in the State for two years is deemed local enough to begin operating a retailer in year 3, but not local enough to continue running it in year 4. Even that might not have been a problem if initial licenses lasted for ten years. But the retail license "expire[s] twelve (12) months following the date of its issuance." Id. § 57-3-213(a). That is the epitome of arbitrariness.
The court offers two key responses to my conclusion that Tennessee's two-year residency requirement for alcohol retailers does not violate the Constitution. One involves history. The court is right that Granholm "conducted an extensive historical analysis." Supra at 614 n.2. My point is that Granholm focused on the history in the run-up to Prohibition and concluded that, by constitutionalizing the Wilson and Webb-Kenyon Acts, the Twenty-first Amendment incorporated a pre-existing anti-discrimination principle. See 544 U.S. at 476-86, 125 S.Ct. 1885. That's why the Court distanced itself from the sweeping language in Young's Market . But that principle concerned discrimination against out-of-state products . See Wilson Act, 27 U.S.C. § 121 (making all imported liquors "subject to the operation and effect of the laws of such State ... to the same extent and in the same manner as though such ... liquors had been produced in such State"); Granholm , 544 U.S. at 483-84, 125 S.Ct. 1885 ("The Wilson Act reaffirmed, and the Webb-Kenyon Act did not displace, the Court's line of Commerce Clause cases striking down state laws that discriminated against liquor produced out of state."); id. at 486, 125 S.Ct. 1885 ("[T]he Twenty-first Amendment ... does not displace the rule that States may not give a discriminatory preference to their own producers .") (emphases added). It is that history that was at issue in Granholm . Even if we can no longer read Young's Market for all it is worth, the Court never purported to overrule its other decisions and holdings approving state authority over alcohol distribution as opposed to production .
The court's second response is of a piece-to focus on language from Granholm (in truth one sentence from *636 Granholm ) to suggest that traditional dormant Commerce Clause principles apply in full to liquor production and distribution, notwithstanding the Twenty-first Amendment. See supra at 614-15 n.2, 619 & n.5, 620-21 n.7 (quoting 544 U.S. at 487, 125 S.Ct. 1885 ). That cuts to the heart of the debate: Did Granholm mean to treat alcohol, including distribution of alcohol, like any other commodity when it comes to the Commerce Clause? If so, the court is right. But as I see it, the text of the Twenty-first Amendment, the history of alcohol regulation in this country, Supreme Court and circuit court precedent, and Granholm itself all point in the other direction. Until the Supreme Court says so, we may not assume that the Twenty-first Amendment no longer "create[s] an exception to the normal operation of the Commerce Clause." Capital Cities , 467 U.S. at 712, 104 S.Ct. 2694. "An extension of this sort is not for us to make." Arnold's Wines , 571 F.3d at 201 (Calabresi, J., concurring).
For these reasons, I respectfully concur in part and dissent in part.