RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0035p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

CLAYTON BYRD, in his official capacity as Executive Director of the Tennessee Alcoholic Beverage Commission; TENNESSEE FINE WINES AND SPIRITS, LLC, dba Total Wine Spirits Beer & More; AFFLUERE INVESTMENTS, INC., dba Kimbrough Fine Wine & Spirits,

*Plaintiffs-Appellees,*

*v.*

TENNESSEE WINE AND SPIRITS RETAILERS ASSOCIATION,

*Defendant - Appellant.*

┐
│
│
│
│
│
│
├ No. 17-5552
│
│
│
│
│
│
┘

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cv-02738—Kevin H. Sharp, District Judge.

Argued:  November 30, 2017

Decided and Filed:  February 21, 2018

Before:  DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

---

#### COUNSEL

**ARGUED:**  Richard L. Colbert, KAY GRIFFIN, PLLC, Nashville, Tennessee, for Appellant. William J. Murphy, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, for Appellee Tennessee Fine Wines and Spirits.  Keith C. Dennen, FARRIS BOBANGO, PLC, Nashville, Tennessee, for Appellee Affluere Investments.  **ON BRIEF:**  Richard L. Colbert, John J. Griffin, Jr., Nina M. Eiler, KAY GRIFFIN, PLLC, Nashville, Tennessee, for Appellant.  William J. Murphy, ZUCKERMAN SPAEDER LLP, Baltimore, Maryland, Edward M. Yarbrough, W. Justin Adams, BONE MCALLESTER NORTON PLLC, Nashville, Tennessee, for Appellee Tennessee Fine Wines and Spirits.  Keith C. Dennen, FARRIS BOBANGO, PLC, Nashville,

Tennessee, for Appellee Affluere Investments.    Sarah K. Campbell, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee Clayton Byrd.

MOORE, J., delivered the opinion of the court in which DAUGHTREY, J., joined, and SUTTON, J., joined in part.  SUTTON, J. (pp. 24–34), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Defendant-Appellant Tennessee Wine and Spirits Retailers Association ("Association") appeals the district court's order granting summary judgment regarding § 57-3-204(b) of Tennessee Code Annotated.  Under § 57-3-204(b), to receive a retailer-alcoholic-beverages license, a person, corporation, or firm needs to be a Tennessee resident for at least two years, and to renew a license, there is a ten-year requirement. After examination, the district court determined that these durational-residency requirements violate the dormant Commerce Clause.

For the reasons discussed below, we **AFFIRM** the district court's judgment declaring § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) in violation of the dormant Commerce Clause and **SEVER** those provisions from the Tennessee statute.

## I. BACKGROUND

In Tennessee, the distribution of alcoholic beverages occurs through a "three-tier system."  *Jelovsek v. Bredesen*, 545 F.3d 431, 433 (6th Cir. 2008).  "The Tennessee Alcoholic Beverage Commission ('TABC') issues separate classes of licenses to manufacturers and distillers, wholesalers, and liquor retailers."  *Id.* at 433–34 (citing Tenn. Code Ann. § 57-3-201).  "Manufacturers are limited to selling to wholesalers; wholesalers may sell to retailers, or in some cases other wholesalers; consumers are required to buy only from retailers."  *Id.* at 434 (citing Tenn. Code Ann. § 404(b)–(d)).

A license from the TABC is required to sell "alcoholic spirituous beverages, including beer and malt beverages."  Tenn. Code Ann. § 57-3-204(a).  However, to obtain a license, an

individual must have "been a bona fide resident of [Tennessee] during the two-year period immediately preceding the date upon which application is made to the commission." *Id.* § 57-3-204(b)(2)(A). Additionally, the statute imposes a ten-year residency requirement to renew the license. *Id.*

A corporation faces similar barriers, and it cannot receive a license "if any officer, director or stockholder owning any capital stock in the corporation, would be ineligible to receive a retailer's license for any reason specified in subdivision (b)(2)." *Id.* § 57-3-204(b)(3)(A). Moreover, "[a]ll of [a corporation's] capital stock must be owned by individuals who are residents of [Tennessee] and either have been residents of the state for the two (2) years immediately preceding the date application is made to the commission or," for renewal, "has at any time been a resident of [Tennessee] for at least ten (10) consecutive years." *Id.* § 57-3-204(b)(3)(B).

Two entities—Plaintiff-Appellee Tennessee Fine Wines and Spirits, LLC, d/b/a Total Wine Spirits Beer & More, and Plaintiff-Appellee Affluere Investments, Inc., d/b/a/ Kimbrough Fine Wine & Spirits—did not satisfy these barriers prior to applying for retail licenses. As of November 2016, Fine Wines's principal address and Affluere's principal address were outside of Tennessee. R. 23-2 (Resp. Ex. 2) (Page ID #133); R. 23-3 (Resp. Ex. 3) (Page ID #134). And Fine Wines's members are not Tennessee residents. R. 55-1 (Mot. Summ. J. Ex. 1 ¶ 5) (Page ID #298). Therefore, the TABC deferred voting on these applications. *Id.* ¶¶ 13, 15 (Page ID #299); R. 1-1 (Compl. ¶ 15) (Page ID #7); R. 1-2 (Affluere Answer ¶ 15) (Page ID #38).

When the Association, which represents Tennessee's business owners, discovered that Fine Wines and Affluere had pending applications, it informed the TABC that litigation was likely. R. 1-1 (Compl. ¶¶ 2, 16, 17) (Page ID #5, 8); R. 80 (Ass'n Am. Answer ¶¶ 2, 16, 17) (Page ID #495, 498). Because of these conflicts, Tennessee's Attorney General filed this action in the Chancery Court for Davidson County, on behalf of Plaintiff-Appellee Clayton Byrd, the Executive Director of the TABC, to obtain a declaratory judgment construing the constitutionality of the durational-residency requirements. R. 1-1 (Compl. at 1) (Page ID #4).

The Defendant Association removed the case to the United States District Court for the Middle District of Tennessee.[1]

The district court determined that the durational-residency requirements are unconstitutional. *See Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 259 F. Supp. 3d 785, 797–98 (M.D. Tenn. 2017). Based on the statutory language, the district court found that the durational-residency requirements are facially discriminatory. *See id.* at 790. And although the Twenty-first Amendment does give Tennessee power to regulate alcoholic beverages, the district court "agree[d] with the Fifth Circuit that 'state regulations of the retailer and wholesaler tiers are not immune from Commerce Clause scrutiny just because they do not discriminate against out-of-state liquor.'" *Id.* at 790, 793 (quoting *Cooper v. Tex. Alcoholic Beverage Comm'n (Cooper II)*, 820 F.3d 730, 743 (5th Cir.), *cert. denied sub nom. Tex. Package Stores Ass'n, Inc. v. Fine Wine & Spirits of N. Tex., LLC*, --- U.S. ---, 137 S. Ct. 494 (2016)). Additionally, nondiscriminatory alternatives could achieve the durational-residency requirements' purposes—citizen health and alcohol regulation. *Id.* at 796–97. The district court therefore determined that Tennessee's durational-residency requirements violate the dormant Commerce Clause and granted Fine Wines's motion for summary judgment. *Id.* at 797–98.

## II. DISCUSSION

We review de novo a district court's decision to grant summary judgment, *Lenscrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005), and we also review de novo a district court's determination of the constitutionality of a state statute, *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006). Granting summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For this determination, we review all facts in a light

---

[1]After the Association removed the action to federal court, R. 1 (Notice Removal at 1) (Page ID #1), the district court realigned Fine Wines and Affluere as plaintiffs because, in his complaint, Byrd contended that the durational-residency requirements may be unconstitutional, which the Attorney General highlighted in two opinions. R. 52 (Op. Mem. at 11) (Page ID #282); R. 53 (Order ¶ 2) (Page ID #289). However, in his response to Fine Wines's motion for summary judgment, Byrd asserted that the durational-residency requirements are not unconstitutional. *See* R. 73 (Resp. at 1–13) (Page ID #450–62). Byrd continues to assert during this appeal that the durational-residency requirements are not unconstitutional. *See* Appellee Byrd Br. at 3.

that is most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A. The Twenty-first Amendment Does Not Immunize Tennessee's Durational-Residency Requirements

Under the Supreme Court's governing standard, Tennessee's interests in the durational-residency requirements are not closely related to its power under the Twenty-first Amendment. Therefore, the Twenty-first Amendment does not immunize Tennessee's durational-residency requirements from scrutiny under the dormant Commerce Clause.

### 1. Tennessee's Durational-Residency Requirements in Light of *Granholm* and *Bacchus*

Section 2 of the U.S. Constitution's Twenty-first Amendment states that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." U.S. Const. amend XXI, § 2. Pursuant to the Twenty-first Amendment, a state has the power to regulate the distribution of alcoholic beverages into the state or within its borders.

"Initially, the Supreme Court afforded the states nearly limitless power to regulate alcohol under the [Twenty-first Amendment]." *Heald v. Engler*, 342 F.3d 517, 522 (6th Cir. 2003), *aff'd sub nom. Granholm v. Heald*, 544 U.S. 460 (2005). However, "as early as the 1960s, the Supreme Court signaled a break with this line of reasoning."[2] *Id.* And in 1984, the

---

[2]The dissent summarizes the history of § 2 to support the conclusion that states have the authority to impose durational-residency requirements on owners because these requirements are regarding intrastate distribution of alcohol beverages, not the interstate flow of product. *See* Dissent Op. at 25–29. However, this history is less persuasive than the dissent makes it sound.

The Supreme Court already conducted an extensive historical analysis in *Granholm*, 544 U.S. at 476–87, to reach its own interpretation of modern precedent: "[w]hen a state statute directly regulates or discriminates against interstate commerce, *or when its effect is to favor in-state economic interests over out-of-state interests*, [the Supreme Court has] generally struck down the statute without further inquiry," *id.* at 487 (emphasis added) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)). Thus, contrary to the dissent's conclusion, the proper backdrop to understand the interplay between the Twenty-first Amendment and the Commerce Clause is this statement in *Granholm*—a state cannot use the Twenty-first Amendment to impede directly or indirectly on interstate commerce; even an effect on interstate commerce is invalid.

Additionally, the dissent fails to acknowledge that the Supreme Court has explicitly transitioned from its original interpretation of the Twenty-first Amendment. For instance, the Supreme Court's opinion in *Granholm*, 544 U.S. at 484–86, abrogated *State Bd. of Equalization v. Young's Mkt. Co.*, 299 U.S. 59 (1936), which the dissent

Supreme Court reiterated in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984), that the Commerce Clause limits a state's power under the Twenty-first Amendment. *Heald*, 342 F.3d at 523.

In *Bacchus*, the Supreme Court noted that "[i]t is by now clear that the [Twenty-first] Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause." 468 U.S. at 275. "To draw a conclusion that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would . . . be an absurd oversimplification." *Id.* (quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 331–32 (1964)). The Supreme Court stated

---

does not acknowledge. In particular, the Supreme Court explicitly rejected the paragraph in *Young's Market* that the dissent quotes on page twenty-eight:

> The aim of the Twenty-first Amendment was to allow States to maintain an effective and uniform system for controlling liquor by regulating its transportation, importation, and use. The Amendment did not give States the authority to pass nonuniform laws in order to discriminate against out-of-state goods, a privilege they had not enjoyed at any earlier time.
>
> Some of the cases decided soon after ratification of the Twenty-first Amendment did not take account of this history and were inconsistent with this view. In *State Bd. of Equalization of Cal. v. Young's Market Co.*, 299 U.S. 59, 62 (1936), for example, the Court rejected the argument that the Amendment did not authorize discrimination:
>
>> "The plaintiffs ask us to limit this broad command [of § 2]. They request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it."
>
> The Court reaffirmed the States' broad powers under § 2 in a series of cases, see *Mahoney v. Joseph Triner Corp.*, 304 U.S. 401 (1938); *Indianapolis Brewing Co. v. Liquor Control Comm'n*, 305 U.S. 391 (1939); *Ziffrin, Inc. v. Reeves*, 308 U.S. 132 (1939); *Joseph S. Finch & Co. v. McKittrick*, 305 U.S. 395 (1939), and unsurprisingly many States used the authority bestowed on them by the Court to expand trade barriers. T. Green, Liquor Trade Barriers: Obstructions to Interstate Commerce in Wine, Beer, and Distilled Spirits 4, and App. I (1940) (stating in the wake of *Young's Market* that "[r]ivalries and reprisals have thus flared up").
>
> It is unclear whether the broad language in *Young's Market* was necessary to the result because the Court also stated that "the case [did] not present a question of discrimination prohibited by the commerce clause." 299 U.S., at 62. The Court also declined, contrary to the approach we take today, to consider the history underlying the Twenty-first Amendment. *Id.*, at 63–64. This reluctance did not, however, reflect a consensus that such evidence was irrelevant or that prior history was unsupportive of the principle that the Amendment did not authorize discrimination against out-of-state liquors. . . .

*Granholm*, 544 U.S. at 484–86 (alterations in original). The Supreme Court also implied that *Young's Market* is inconsistent with the Wilson Act and the Webb-Kenyon Act. *See id.* at 484–85. Therefore, cases such as *Young's Market* are not reliable for this analysis.

that "both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution and each must be considered in light of the other and in the context of the issues and interests at stake in any concrete case." *Id.* (quoting *Hostetter*, 377 U.S. at 332). Additionally, the Supreme Court emphasized that "[s]tate laws that constitute mere economic protectionism are therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Id.* at 276. Because of these issues, the Supreme Court stated that a court needs to consider "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Id.* at 275–76 (quoting *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 714 (1984)).

The Supreme Court examined Hawaii's tax exemption at the wholesale tier for okolehao, which is a root from an indigenous shrub, and pineapple wine in *Bacchus*. *Id.* at 265. The question before the Supreme Court was "whether the principles underlying the Twenty-first Amendment are sufficiently implicated by the exemption for okolehao and pineapple wine to outweigh the Commerce Clause principles that would otherwise be offended." *Id.* at 275. The Supreme Court noted that Hawaii did "not seek to justify its tax on the ground that it was designed to promote temperance or to carry out any other purpose of the Twenty-first Amendment, but instead acknowledges that the purpose was 'to promote a local industry.'" *Id.* at 276. Thus, the Supreme Court determined that the Twenty-first Amendment did not immunize Hawaii's law "because the tax violates a central tenet of the Commerce Clause but is not supported by any clear concern of the Twenty-first Amendment." *Id.*

In *Granholm*, the Supreme Court examined whether "a State's regulatory scheme that permits in-state wineries directly to ship alcohol to consumers but restricts the ability of out-of-state wineries to do so violate[s] the dormant Commerce Clause in light of § 2 of the Twenty-first Amendment." 544 U.S. at 471. When considering this question, the Supreme Court stated that "[s]tate policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." *Id.* at 489. And because the "instant cases" before the Supreme Court "involve[d] straightforward attempts to discriminate in favor of local producers . . . [t]he discrimination [was] contrary to the Commerce Clause and [was] not

saved by the Twenty-first Amendment." *Id.* The Supreme Court also reasserted its previous recognition that "the three-tier system itself is 'unquestionably legitimate.'" *Id.* at 489 (quoting *North Dakota v. United States*, 495 U.S. 423, 432 (1990)).

The interaction between *Bacchus* and *Granholm* has created some uncertainty. Does scrutiny under the dormant Commerce Clause apply only when an alcoholic-beverages law regulates producers or products? And does the Twenty-first Amendment automatically immunize a state law regarding retailers and wholesalers of alcoholic beverages? The Second, Fourth, Fifth, and Eighth Circuits have attempted to reconcile the cases. *Cooper II*, 820 F.3d at 743; *S. Wine & Spirits of Am., Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 809, 810 (8th Cir. 2013); *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 190 (2nd Cir. 2009); *Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006).

For example, in *Arnold's Wines* the Second Circuit examined a state law allowing in-state licensed retailers to deliver alcoholic beverages to customers' homes but preventing out-of-state retailers from doing the same. 571 F.3d at 188. The court stated that "[t]he *Granholm* Court set forth the test for determining the constitutionality of state liquor regulations," which was that "[i]f the state measure discriminates in favor of in-state producers or products, the regulatory regime is not automatically saved by the Twenty-first Amendment simply by virtue of the special nature of the product regulated." *Id.* at 189. Additionally, the court reasoned that "[i]t is only where states create discriminatory exceptions to the three-tier system, allowing in-state, but not out-of-state, liquor to bypass the three regulatory tiers, that their laws are subject to invalidation based on the Commerce Clause." *Id.* at 190. Thus, "Appellants' challenge to the ABC Law's provisions requiring all wholesalers and retailers be present in and licensed by the state . . . [was] a frontal attack on the constitutionality of the three-tier system itself." *Id.* "Appellants' argument [was] therefore directly foreclosed by the *Granholm* Court's express affirmation of the legality of the three-tier system." *Id.* at 190–91.

In *Southern Wine*, the Eighth Circuit examined Missouri's law requiring a corporation— including its directors, officers, and super-majority of shareholders—to be residents of Missouri for three years prior to obtaining a wholesaler-alcoholic-beverages license. 731 F.3d at 802–03. When reviewing "the current state of the relationship between the dormant Commerce Clause

and the Twenty-first Amendment," the Eighth Circuit noted that, "in its most recent pronouncement on the subject, the Supreme Court simultaneously cited *Bacchus* and said that 'state policies are protected under the Twenty-first Amendment when they treat liquor produced out of the state the same as its domestic equivalent.'" *Id.* at 809 (citing *Granholm*, 544 U.S. at 489). "Given *Granholm*'s recency and specificity," the court decided that *Granholm* provided the "best guidance." *Id.* The Eighth Circuit concluded that "[i]f it is beyond question that States may require wholesalers to be 'in-state' without running afoul of the Commerce Clause, then . . . States have flexibility to define the requisite degree of 'in-state' presence to include the in-state residence of wholesalers' directors and officers, and a super-majority of their shareholders." *Id.* at 810 (citation omitted). "Insofar as *Granholm* imported [*Bacchus*'s] balancing approach to regulations of the three-tier system, . . . it drew a bright line between the producer tier and the rest of the system." *Id.* Therefore, in the view of the Eighth Circuit, the residency requirement for alcoholic-beverages wholesalers did not violate the dormant Commerce Clause. *See id.* at 809.

Conversely, the Fifth Circuit determined that *Bacchus* is still good law. In *Cooper II*, the defendant, a Texas trade association, moved for relief from an injunction under Federal Rule of Civil Procedure 60(b) on the ground that *Granholm* created a significant change in the law since the Fifth Circuit enjoined a state durational-residency requirement in *Cooper v. McBeath (Cooper I)*, 11 F.3d 547 (5th Cir. 1994). *Cooper II*, 820 F.3d at 734, 742. However, the Fifth Circuit disagreed. After examining the language in *Granholm*, the Fifth Circuit held that *Granholm* did not overrule or alter *Bacchus*. *Id.* at 742. And regarding *Granholm*'s statement that "state policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent," the Fifth Circuit determined that this statement did not limit scrutiny under the Commerce Clause to producers because the statement was dicta. *Id.* at 743. Instead, the Fifth Circuit "interpreted [*Granholm*] as reaffirming the applicability of the Commerce Clause to state alcohol regulations, but to a lesser extent when the

regulations concern the retailer or wholesaler tier as distinguished from the producer tier, of the three-tier distribution system."[3] *Id.*

We find the Fifth Circuit's reconciliation of *Bacchus* and *Granholm* persuasive for six reasons. First, the Supreme Court explicitly declined to overrule *Bacchus* in *Granholm*. Second, in *Granholm*, the Supreme Court reiterated *Bacchus*'s concern about the protection of economic interests across state lines, suggesting that the Twenty-first Amendment does not automatically immunize a state's alcoholic-beverages law regarding wholesalers or retailers. Third, the Supreme Court emphasized that the Twenty-first Amendment does not permit a state to discriminate on the basis of citizenship; accordingly, the flow of products across state lines is not the sole concern under the dormant Commerce Clause. Fourth, the Supreme Court again stated that the Commerce Clause limits the Twenty-first Amendment. Fifth, the Supreme Court also stated that there are times when the three-tier system is invalid. And lastly, *Granholm* did not limit its application of the Commerce Clause to alcoholic-beverages laws regarding producers.[4] Thus, *Bacchus* and *Granholm* are reconcilable.

---

[3]The dissent argues that the Fifth Circuit misread *Granholm* because the Fifth Circuit's test would allow a court to replace the views of the state legislature with a court's own perspective. *See* Dissent Op. at 32. For this argument, the dissent states that *Granholm* "gave [states] 'virtually complete control' over 'how to structure th[at] . . . . system." *Id.* (second alteration in original) (quoting *Granholm*, 544 U.S. at 488).

However, the dissent skews this statement in *Granholm*. First, *Granholm* itself did not grant states complete control regarding the composition of a distribution system; instead, the Supreme Court stated that "*[t]he Twenty-first Amendment* grants the States *virtually* complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Granholm*, 544 U.S. at 488 (emphasis added) (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)). By using the word "virtually," the Supreme Court noted that there are limits to a state's power. Additionally, immediately after making this statement, the Supreme Court qualified the type of control that is acceptable: "A State which chooses to ban the sale and consumption of alcohol altogether could bar its importation; and, as our history shows, it would have to do so to make its laws effective. States may also assume direct control of liquor distribution through state-run outlets or funnel sales through the three-tier system." *Id.* at 488–89. After noting the types of restrictions that are valid, the Supreme Court declared that other "discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment." *Id.* at 489. In the preceding paragraph, the Supreme Court noted that "the Twenty-first Amendment did not give the States complete freedom to regulate where other constitutional principles are at stake. . . . [T]he Twenty-first Amendment does not immunize all laws from Commerce Clause challenge." *Id.* at 488 (discussing *Bacchus*, *Brown-Forman*, and *Healy*). Thus, contrary to the dissent's argument, the Fifth Circuit's reasoning is in line with the Supreme Court's determinations in *Granholm*—the Twenty-first Amendment does not validate a state legislature's discriminatory laws.

[4]Even after the Supreme Court decided *Granholm*, we have continued to rely on *Bacchus*. *See Jelovsek*, 545 F.3d at 437 ("The parties, as well as the district court, spent a great deal of effort examining whether, and to what extent, *Granholm* applies to the cases before us. We believe *Bacchus* is also instructive in this case.").

First, the Supreme Court in *Granholm* explicitly declined to overrule *Bacchus*; therefore, the reasoning in *Bacchus* still stands:

> Recognizing that *Bacchus* is fatal to their position, the States suggest it should be overruled or limited to its facts. As the foregoing analysis makes clear, we decline their invitation. Furthermore, *Bacchus* does not stand alone in recognizing that the Twenty-first Amendment did not give States complete freedom to regulate where other constitutional principles are at stake. A retreat from *Bacchus* would also undermine *Brown-Forman* and *Healy*. These cases invalidated state liquor regulations under the Commerce Clause. Indeed, *Healy* explicitly relied on the discriminatory character of the Connecticut price affirmation statute. 491 U.S., at 340–41. *Brown-Forman* and *Healy* lend significant support to the conclusion that the Twenty-first Amendment does not immunize all laws from Commerce Clause challenge.

*Granholm*, 544 U.S. at 488. Clearly, the Supreme Court refused to overrule *Bacchus* or limit *Bacchus* to its facts.

Second, in *Granholm*, the Supreme Court focused on a general Commerce Clause principle—the prohibition of discrimination against out-of-state economic interests. The Court began by discussing this general principle: "[t]ime and again this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state *economic interests* that benefits the former and burdens the latter.'" *Id.* at 472 (emphasis added) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state *economic interests* over out-of-state interests, [the Supreme Court has] generally struck down the statute without further inquiry."[5] *Id.* at 487 (emphasis added) (quoting *Brown-Forman*, 476 U.S. at 579).

---

[5]The dissent seems to argue that the Commerce Clause limits only state actions regarding alcohol distribution that regulate interstate activity, not intrastate activity having an effect on interstate commerce. However, the Supreme Court's statement that "[s]tates may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses," seems to suggest otherwise. *Granholm*, 544 U.S. at 472. Additionally, the Supreme Court has stated that "[w]hen a state statute directly regulates or discriminates against interstate commerce, *or when its effect is to favor in-state economic interests over out-of-state interests*, [the Supreme Court has] generally struck down the statute without further inquiry." *Id.* at 487 (emphasis added) (quoting *Brown-Forman*, 476 U.S. at 579). In *Brown-Forman*, the Supreme Court determined that the Twenty-first Amendment did not protect New York's law that required a distiller or agent to affirm that its alcohol prices were not lower in any other state because that law would have a negative economic effect in other states. *See Brown-Forman*, 476 U.S. at 585. Here, because Tennessee is favoring in-state economic interests over out-of-state

Third, the Supreme Court also discussed the general principle that a state cannot bar out-of-state citizens from engaging in its economy; thus, a state's alcoholic-beverages law is not automatically valid just because it "treat[s] liquor produced out of state the same as its domestic equivalent."[6]  *Id.* at 489.  The Supreme Court stated that "[t]he rule prohibiting state discrimination against interstate commerce follows also from the principle that States should not be compelled to negotiate with each other regarding favored or disfavored status for their own citizens." *Id.* at 472.  Laws cannot "deprive citizens of their right to have access to the markets of other States on equal terms." *Id.* at 473.  Additionally, the Supreme Court has "viewed with particular suspicion state statutes requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Id.* at 475.  For instance, in *Granholm*, the Supreme Court stated that "New York's in-state presence requirement runs contrary to [the Supreme Court's] admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* at 475 (first quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963); and then citing *Ward v. Maryland*, 12 Wall. 418 (1871)).  Therefore, scrutiny under the dormant Commerce Clause is not limited to laws regarding products.

Fourth, the Supreme Court again emphasized in *Granholm* that the Commerce Clause limits a state's power under the Twenty-first Amendment.  According to the Court, "[t]he central purpose of the [Twenty-first Amendment] was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.* at 487 (quoting *Bacchus*, 468 U.S. at 276).  Regardless of the Twenty-first Amendment, "state regulation of alcohol is limited by the nondiscrimination principle of the Commerce Clause." *Id.* (first citing *Bacchus*, 468 U.S. at 276; then citing *Brown-Forman*, 476 U.S. at 573; and then citing *Healy v. Beer Inst.*, 491 U.S. 324

---

economic interests by preventing out-of-state citizens from engaging in Tennessee's economy for several years, Tennessee is not merely regulating the distribution of alcohol within its borders—it is dictating who can and cannot engage in its economy.

[6]The dissent also attempts to limit *Granholm*'s holding to the statement that a law is invalid only when it "treat[s] liquor *produced out of state* the same as its domestic equivalent." *See* Dissent Op. at 31 (quoting *Granholm*, 544 U.S. at 489).  However, the dissent does not acknowledge Section II.A in *Granholm*, which devotes two pages to the principle that a state cannot bar out-of-state citizens from engaging in its economy. *See Granholm*, 544 U.S. at 472–73.

(1989)).  Therefore, in *Granholm*, the Supreme Court continued to recognize that the Commerce Clause does limit the Twenty-first Amendment.

Fifth, a state's alcoholic-beverages law is not immune simply because it is part of a three-tier system.  In *Granholm*, New York and Michigan "argue[d] that any decision invalidating their direct-shipment laws would call into question the constitutionality of the three-tier system."  *Id.* at 488.  But the Supreme Court disagreed, noting that, although three-tier systems are "unquestionably legitimate," those systems are not valid when they "involve straightforward attempts to discriminate in favor of local producers."  *Id.* at 488, 489.  Based on this language, a state's alcoholic-beverages law is not automatically valid simply because it addresses a portion of a three-tier system.[7]

---

[7]The dissent asserts that the Supreme Court "never purported to overrule its prior statements and holdings approving state authority over alcohol *distribution* as opposed to *production*."  Dissent Op. at 34.  And, according to the dissent, "[u]ntil the Supreme Court says so, we may not assume that the Twenty-first Amendment no longer 'create[s] an exception to the normal operation of the Commerce Clause.'"  *Id.* (second alteration in original) (quoting *Capital Cities*, 467 U.S. at 712).

But the Supreme Court has said so.  In fact, it categorized its modern precedent into three distinct categories:  (1) the Twenty-first Amendment does not protect state laws that violate other parts of the Constitution, (2) the Twenty-first Amendment does not eliminate Congress' Commerce Clause power over alcoholic beverages, *i.e.*, "products," and (3) the Commerce Clause limits state regulation of alcohol, *i.e.*, distribution.  *See Granholm*, 544 U.S. at 486–87.  The language that the Supreme Court uses to describe these boundaries is particularly compelling:

> The modern § 2 cases fall into three categories.
>
> First, the Court has held that state laws that violate other provisions of the Constitution are not saved by the Twenty-first Amendment.  The Court has applied this rule in the context of the First Amendment, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996); the Establishment Clause, *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982); the Equal Protection Clause, [*Craig v. Boren*, 429 U.S. 190, 204–09 (1976)]; the Due Process Clause, *Wisconsin v. Constantineau*, 400 U.S. 433 (1971); and the Import–Export Clause, *Department of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341 (1964).
>
> Second, the Court has held that § 2 does not abrogate Congress' Commerce Clause powers *with regard to liquor. Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691 (1984); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980).  The argument that "the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause" for alcoholic beverages has been rejected.  *Hostetter*, 377 U.S., at 331–332.  Though the Court's language in *Hostetter* may have come uncommonly close to hyperbole in describing this argument as "an absurd oversimplification," "patently bizarre," and "demonstrably incorrect," *ibid.*, the basic point was sound.
>
> Finally, and most relevant to the issue at hand, the Court has held that *state regulation of alcohol is limited* by the nondiscrimination principle of the Commerce Clause.  *Bacchus*, 468 U.S., at 276; *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986); *Healy v. Beer Institute*, 491 U.S. 324 (1989).  "When a state statute directly regulates or

And lastly, the Supreme Court did not state that the Commerce Clause applies only to alcoholic-beverages laws regarding producers. The statement that "[s]tate policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent" must be read in its context. *Id.* at 489. The Supreme Court wrote the full paragraph as follows:

> The States argue that any decision invalidating their direct-shipment laws would call into question the constitutionality of the three-tier system. This does not follow from our holding. "The Twenty-first Amendment grants the States virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system." *Midcal, supra,* at 110. A State which chooses to ban the sale and consumption of alcohol altogether could bar its importation; and, as our history shows, it would have to do so to make its laws effective. States may also assume direct control of liquor distribution through state-run outlets or funnel sales through the three-tier system. We have previously recognized that the three-tier system itself is "unquestionably legitimate." *North Dakota v. United States,* 495 U.S., at 432. See also *id.,* at 447 (Scalia, J., concurring in judgment) ("The Twenty-first Amendment . . . empowers North Dakota to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler"). *State policies are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent.* The instant cases, in contrast, involve straightforward attempts to *discriminate in favor of local producers.* The discrimination is contrary to the Commerce Clause and is not saved by the Twenty-first Amendment.

*Id.* at 488–89 (emphasis added). A fair reading of this passage leads to one conclusion: the Supreme Court discussed the relationship between the dormant Commerce Clause and the Twenty-first Amendment in the context of "producers" simply because *Granholm* involved statutes addressing that step in the three-tier system. The Supreme Court did not give any indication that the Twenty-first Amendment automatically protects laws regarding wholesalers and retailers.

---

discriminates against interstate commerce, *or when its effect is to favor in-state economic interests over out-of-state interests*, we have generally struck down the statute without further inquiry." *Brown-Forman, supra,* at 579.

*Id.* (emphasis added). Therefore, the Supreme Court has stated that the Commerce Clause applies to the production of alcoholic beverages and their distribution.

In summary, based on the language in *Granholm*, the Supreme Court's reasoning in *Bacchus* continues to apply along with *Granholm* itself. Therefore, we now examine Tennessee's durational-residency requirements in light of *Granholm* and *Bacchus*.

**2. Tennessee's Interests in the Durational-Residency Requirements Are Not So Closely Related to the Powers Reserved by the Twenty-first Amendment**

To determine whether the Twenty-first Amendment immunizes a state's alcoholic-beverages law from scrutiny under the dormant Commerce Clause, a court needs to examine "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." *Bacchus*, 468 U.S. at 275–76 (quoting *Capital Cities*, 467 U.S. at 714).

In *Cooper I,* the Fifth Circuit examined a Texas law that required an applicant for a mixed-beverage permit to be a Texas resident for one year before submitting an application. 11 F.3d at 549, 550. The law also had a section that "include[d] what is commonly known as the '51 percent rule,' which forbids the issuance of a permit to any corporation 'unless at least 51 percent of the stock of the corporation is owned at all times by citizens who have resided within the state for a period of three years.'" *Id.* at 549. When examining the state's interest in these residency restrictions, the Fifth Circuit stated that "the state's interest in facilitating background checks of permit applicants by discriminating against nonresidents is not within the 'core concerns' of the Twenty-first Amendment." *Id.* at 555 (comparing *North Dakota*, 495 U.S. 423). The Fifth Circuit emphasized that "[t]he statutory barrier Texas has erected against non-residents who wish to obtain mixed beverage permits results in shielding the State's operators from the rigors of outside competition." *Id.* Therefore, it determined that "[t]he discriminatory . . . residency requirement inherent in the challenged statutory provisions cannot stand." *Id.* at 555–56.

Then, in *Cooper II*, the Fifth Circuit bolstered its reasoning in *Cooper I* and stated that *Bacchus*'s reasoning still stands:

> In *Wine Country* [*Gift Baskets.com v. Steen*, 612 F.3d 809 (5th Cir. 2010)], we interpreted [*Granholm*] as reaffirming the applicability of the Commerce

Clause to state alcohol regulations, but to a lesser extent when the regulations concern the retailer or wholesaler tier as distinguished from the producer tier, of the three-tier distribution system. *Id.* at 820–21. State regulations of the producer tier "are protected under the Twenty-first Amendment when they treat liquor produced out of state the same as its domestic equivalent." [*Granholm*], 544 U.S. at 489, 125 S.Ct. 1885. But state regulations of the retailer and wholesaler tiers are not immune from Commerce Clause scrutiny just because they do not discriminate against out-of-state liquor.

Because of the Twenty-first Amendment, states may impose a physical-residency requirement on retailers and wholesalers of alcoholic beverages despite the fact that the residency requirements favor in-state over out-of-state businesses. *Wine Country*, 612 F.3d at 821. The Twenty-first Amendment does not, however, authorize states to impose a durational-residency requirement on the *owners* of alcoholic beverage retailers and wholesalers. *Id.* (citing *Cooper* [*I*], 11 F.3d at 555). Distinctions between in-state and out-of-state retailers and wholesalers are permissible only if they are an inherent aspect of the three-tier system. *See id.* at 818.

820 F.3d at 743 (footnote omitted). In this language, the Fifth Circuit created an important distinction: requiring retailer- or wholesaler-alcoholic-beverages businesses to be within the state may be essential to the three-tier system, but imposing durational-residency requirements is not, particularly when those durational-residency requirements govern owners.[8]

Here, Tennessee's durational-residency requirements are nearly identical to the requirements in *Cooper I*. In Tennessee, to obtain a retail-alcoholic-beverages permit, individuals, corporations, firms, directors, officers, and stockholders all need to reside within the state for two years. *See* Tenn. Code Ann. § 57-3-204(b). And although requiring wholesaler or retailer businesses to be physically located within Tennessee may be an inherent aspect of a three-tier system, *see Cooper II*, 820 F.3d at 743, imposing durational-residency requirements is not inherent—a three-tier system can still function without these restrictions.

---

[8]The dissent asserts that in-state distribution regulations are always discriminatory in some manner, and in some ways, the dissent is correct that "[w]hat matters is what type of discrimination is *permissible*." Dissent Op. at 32. However, the Fifth Circuit has acknowledged this dilemma, and it rectified the issue—requiring wholesalers and retailers to be in the state is permissible, but requiring owners to reside within the state for a certain period is not. *See Cooper II*, 820 F.3d at 743. Additionally, the dissent argues that *Jelovsek* has not answered this question, *see* Dissent Op. at 31–32, which is contrary to *Jelovsek*'s statement that the two-year durational-residency requirement "impermissibly favor[s] Tennessee interests at the expense of interstate commerce." *Jelovsek*, 545 F.3d at 438.

Tennessee's durational-residency requirements do not relate to the flow of alcoholic beverages within the state. Instead, they regulate the flow of individuals who can and cannot engage in economic activities. The Twenty-first Amendment gives a state the power to oversee the alcoholic-beverages business, but it does not give a state the power to dictate where individuals live, because a state's alcoholic-beverages laws "cannot deprive citizens of their right to have access to the markets of other States on equal terms." *Granholm*, 544 U.S. at 473. "The central purpose of the [Twenty-first Amendment] was not to empower States to favor local liquor industries by erecting barriers to competition." *Bacchus*, 468 U.S. at 276. Therefore, the Twenty-first Amendment does not immunize Tennessee's durational-residency requirements from scrutiny under the dormant Commerce Clause.

**B.  Tennessee's Durational-Residency Requirements Violate the Dormant Commerce Clause**

Under the Commerce Clause, Congress can "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause gives Congress authority to regulate interstate commerce, the converse is that states cannot impede Congress's power by "unjustifiably . . . discriminat[ing] against or burden[ing] the interstate flow of articles of commerce." *Or. Waste*, 511 U.S. at 98. This dormant Commerce Clause prevents "economic protectionism"—*e.g.*, a state protecting in-state economic interests by burdening out-of-state economic interests. *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 369 (6th Cir. 2013) (quoting *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)). The dormant Commerce Clause helps to "effectuate[] the Framers' purpose to 'prevent a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole.'" *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330–31 (1996) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)).

"To determine whether a statute violates the Commerce Clause, [we] must first determine whether the statute discriminates against interstate commerce, either by discriminating on its face, by having a discriminatory purpose, or by discriminating in practical effect." *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 431–32 (6th Cir. 2008) (citing *E. Ky. Res. v. Fiscal Court*, 127 F.3d 532, 540 (6th Cir. 1997)). "If the statute is discriminatory, . . . it is virtually per se

invalid, unless the state can demonstrate that it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Id.* at 432 (quoting *Granholm*, 544 U.S. at 489). In contrast, a nondiscriminatory statute is presumed valid "unless the burdens on interstate commerce are 'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Because Tennessee's durational-residency requirements are facially discriminatory and there is no evidence that Tennessee cannot achieve its goals through nondiscriminatory means, we hold that § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) are unconstitutional.

### 1. The Durational-Residency Requirements Are Facially Discriminatory

In *Jelovsek*, we examined § 57-3-207(d) of Tennessee Code Annotated, which "require[d] a two-year Tennessee residency before a winery license may be obtained and, if the applicant is a corporation, all of the capital stock must be owned by two-year Tennessee residents." 545 F.3d at 438. When reviewing this language, we found that the provision was "discriminatory on [its] face, and in [its] purpose." *Id.* This "provision[] impermissibly favor[ed] Tennessee interests at the expense of interstate commerce." *Id.*

The statutory language presently before us is very similar to the statutory language that we already examined in *Jelovsek*; the relevant statute here provides the following:

> No retail license under this section may be issued to any individual: . . . Who has not been a bona fide resident of this state during the two-year period immediately preceding the date upon which application is made to the commission or, with respect to renewal of any license issued pursuant to this section, who has not at any time been a resident of this state for at least ten (10) consecutive years[.]

Tenn. Code Ann. § 57-3-204(b)(2)(A). And the statute here imposes similar requirements on corporations:

> (A) No retail license shall be issued to any corporation if any officer, director or stockholder owning any capital stock in the corporation, would be ineligible to receive a retailer's license for any reason specified in subdivision (b)(2), if application for such retail license had been made by the officer, director or stockholder in their individual capacity;

(B) All of its capital stock must be owned by individuals who are residents of this state and either have been residents of the state for the two (2) years immediately preceding the date application is made to the commission or, with respect to renewal of any license issued pursuant to this section, who has at any time been a resident of this state for at least ten (10) consecutive years;

. . . .

(D) No stock of any corporation licensed under this section shall be transferred to any person who is not a resident of this state and either has not been a resident of the state for at least two (2) years next preceding or who at any time has not been a resident of this state for at least ten (10) consecutive years.

*Id.* § 57-3-204(b)(3)(A)–(B), (D).   Because the statute contains these durational-residency requirements, it prevents out-of-state residents from obtaining retail licenses and protects in-state residents who are retailers.[9]   Therefore, we hold that § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) are facially discriminatory.

## 2. Tennessee Could Achieve Its Goals with a Reasonable, Nondiscriminatory Alternative

Tennessee has provided purposes in the statute for imposing oversight of alcoholic beverages; the statute states the following:

Because licenses granted under this section include the retail sale of liquor, spirits and high alcohol content beer which contain a higher alcohol content than those contained in wine or beer, . . . it is in the interest of this state to maintain a higher degree of oversight, control and accountability for individuals involved in the ownership, management and control of licensed retail premises.   For these reasons, it is in the best interest of the health, safety and welfare of this state to require all licensees to be residents of this state as provided herein and the commission is authorized and instructed to prescribe such inspection, reporting and educational programs as it shall deem necessary or appropriate to ensure that the laws, rules and regulations governing such licensees are observed.

---

[9]Because *Jelovsek* dealt with wine production, the dissent argues that *Jelovsek* does not dictate the outcome here.  *See* Dissent Op. at 31–32.  Nevertheless, the language in *Jelovsek* suggests otherwise.  In *Jelovsek*, this court stated that "*[o]ther provisions* of the Grape and Wine Law are discriminatory on their face, and in their purpose.  For example, the Grape and Wine Law requires a two-year Tennessee residency before a winery license may be obtained and, if the applicant is a corporation, all of the capital stock must be owned by two-year Tennessee residents." *Jelovsek*, 545 F.3d at 438 (emphasis added).  Although the surrounding language does discuss the portions of the statute addressing wine production, in the sentence actually examining the durational-residency requirement, this court did not use the words "product" or "producers." *See id.*  Thus, this court declared that a two-year residency requirement is invalid in a statement separate and apart from any portion of the opinion addressing wine production; unlike the dissent, we cannot shrug off this holding of *Jelovsek*.

*Id.* § 57-3-204(b)(4). This language asserts two legitimate purposes for the residency restrictions on retailers: (1) protecting "the health, safety and welfare" of Tennessee's citizens and (2) using a higher level of oversight and control over liquor retailers. *See North Dakota*, 495 U.S. at 432 (identifying "the interest of promoting temperance, ensuring orderly market conditions, and raising revenue").

However, neither Byrd nor the Association argues that a reasonable, nondiscriminatory alternative cannot achieve Tennessee's goals. And at oral argument, Fine Wines described several alternative means: requiring (1) a retailer's general manager to be a resident of the state, (2) both in-state and out-of-state retailers to post a substantial bond to receive a license, and (3) public meetings regarding the issuance of a license. Arguably, Tennessee can achieve its goals through nondiscriminatory means. For instance, it could implement technological improvements, such as creating an electronic database to monitor liquor retailers. But neither Byrd nor the Association argues that a reasonable, nondiscriminatory alternative cannot achieve Tennessee's goals. Therefore, Byrd and the Association have not met their burden.

In summary, the durational-residency requirements in § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) are unconstitutional because (1) they are facially discriminatory and (2) neither Byrd nor the Association has shown that a nondiscriminatory alternative cannot achieve Tennessee's goals.

## C.  We Sever § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) from the Rest of the Statute

"[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem" by (1) "enjoin[ing] only the unconstitutional applications of a statute while leaving other applications in force" or (2) "sever[ing] its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006). "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Id.* at 329 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). However, we must be "mindful that our constitutional mandate and institutional

competence are limited," and we must "restrain ourselves from 'rewriting state law to conform it to constitutional requirements' even as we strive to salvage it." *Id.* at 329 (quoting *Virginia v. Am. Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1998)). We also must remember that "the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'" *Id.* at 330 (quoting *Califano v. Westcott*, 443 U. S. 76, 94 (1979)).

"Whether a portion of a state's statute is severable is determined by the law of that state." *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 371 (6th Cir. 2006). In Tennessee, "[t]he doctrine of elision allows a court, under appropriate circumstances when consistent with the expressed legislative intent, to elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." *State v. Tester*, 879 S.W.2d 823, 830 (Tenn. 1994). The Tennessee Supreme Court has stated the following regarding the doctrine:

> The doctrine of elision is not favored. The rule of elision applies if it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted, and those portions of the statute which are not objectionable will be held valid and enforceable provided, of course, there is left enough of the act for a complete law capable of enforcement and fairly answering the object of its passage. However, a conclusion by the court that the legislature would have enacted the act in question with the objectionable features omitted ought not to be reached unless such conclusion is made fairly clear of doubt from the face of the statute. Otherwise, its decree may be judicial legislation. The inclusion of a severability clause in the statute has been held by this Court to evidence an intent on the part of the legislature to have the valid parts of the statute enforced if some other portion of the statute has been declared unconstitutional.

*Id.* at 830 (quoting *Gibson Cty. Special Sch. Dist. v. Palmer*, 691 S.W.2d 544, 551 (Tenn. 1985)). Tennessee's general assembly has also provided a general severability statute, which states the following:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific

provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

Tenn. Code Ann. § 1-3-110. Although this statute "does not automatically make [the doctrine of elision] applicable to every situation[,] . . . when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate." *State v. Crank*, 468 S.W.3d 15, 29 (Tenn. 2015) (quoting *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)).

Applying Tennessee's doctrine of elision, we hold that we can sever § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) from the rest of the statute. In the statute, in addition to protecting Tennessee citizens by imposing residency requirements, the legislature also stated that Tennessee wanted "to maintain a higher degree of oversight, control and accountability for individuals involved in the ownership, management and control of licensed retail premises."[10] Tenn. Code Ann. § 57-3-204(b)(4). Review of § 57-3-204 reveals that the statute contains extensive restrictions relating to this purpose. For instance, an individual cannot receive a retail license if he or she "is not twenty-one (21) years of age or older" or "has been convicted of a felony." Tenn. Code Ann. § 57-3-204(b)(2)(B), (D). Additionally, portions of the statute relate to application fees. *See* Tenn. Code Ann. § 57-3-204(b)(1). Because the statute contains various provisions that are unrelated to the durational-residency requirements and that relate to the

---

[10]By arguing that drunk driving, domestic abuse, and underage drinking are important interests, the dissent concludes that the durational-residency requirements would promote health, safety, and welfare. Dissent Op. at 30. However, in *Granholm*, the Supreme Court did not credit such blanket assertions. *See Granholm*, 544 U.S. at 489–93 (stating that "Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state goods" and that "the States provide[d] little concrete evidence for the sweeping assertion that they cannot police direct shipments by out-of-state wineries" to prevent underage drinking and tax evasion). In fact, even in the Supreme Court cases that the dissent cites for support, the Supreme Court required some type of evidentiary showing. *See North Dakota*, 495 U.S. at 433 & n.5 (relying on an affidavit to conclude that "[t]he risk of diversion into the retail market and disruption of the liquor distribution system is thus both substantial and real."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (stating "that demand, and hence consumption throughout the market, is somewhat lower whenever a higher, noncompetitive price level prevails. However, without any findings of fact, or indeed any evidentiary support whatsoever, we cannot agree with the assertion that the price advertising ban will significantly advance the State's interest in promoting temperance."). Therefore, these blanket assertions in the statute are not enough, and Tennessee has not provided any evidence that the durational-residency requirements will promote its alleged interests.

legislature's purpose, we sever the unconstitutional durational-residency provisions, *i.e.*, § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D), from the rest of the statute.[11]

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's judgment declaring § 57-3-204(b)(2)(A), (3)(A)–(B), and (3)(D) in violation of the dormant Commerce Clause and **SEVER** those provisions from the Tennessee statute.

---

[11]According to the dissent, requiring 51% of stockholders to satisfy the durational-residency requirements is valid, *see* Dissent Op. at 33, but the dissent fails to acknowledge that a 51% requirement impermissibly stifles interstate commerce. For instance, the Supreme Court has "struck down a New York law that imposed a higher tax on transfers of stock occurring outside the State than on transfers involving a sale within the State" because "the Commerce Clause limits the manner in which States may legitimately compete for interstate trade, for 'in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.'" *Bacchus*, 468 U.S. at 272 (quoting *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 337 (1977)). The Supreme Court has also "struck down the Illinois Business Takeover Act, which required that a takeover offer for a target company having a specified connection to Illinois be registered with the Secretary of State and mandated that such an offer was not to become effective for 20 days, during which time the offer would be subject to administrative evaluation" because "if Illinois were free to enact such legislation, others [sic] States similarly were so empowered, 'and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled.'" *Healy*, 491 U.S. at 333 n.9 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982)). Thus, because imposing durational-residency requirements on stockholders prevents shares from freely flowing throughout states, a 51 % requirement still allows a state to engage in economic protectionism.

Additionally, the dissent concludes that the ten-year requirement is the "epitome of arbitrariness" because "[T]ennessee offered no reason why a person who has resided in the State for two years is deemed local enough to begin operating a retailer in year 3, but not local enough to continue running it in year 4." Dissent Op. at 33. But, the dissent's argument also applies to the two-year requirement because, as previously discussed, Tennessee has offered no evidence to prove that the two-year requirement advances its goals. What makes two the magic number? Why is one year not enough? What about a six-month requirement? Without answers to these questions, the two-year requirement is also "the epitome of arbitrariness." Furthermore, in *Jelovsek*, 545 F.3d at 438, this court already determined that a two-year residency requirement is invalid.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part.  Tennessee requires sellers of alcohol to have a retail license.  To obtain a license, the applicant, including any officers and directors, must be "a bona fide resident of th[e] state during the two-year period immediately preceding" the application.  Tenn. Code Ann. §§ 57-3-204(b)(2)(A), (b)(3)(A).  The licensing requirement applies to all sales of alcohol in the State, whether the alcohol was produced in Tennessee or elsewhere.  I would uphold these modest requirements, as the text of the Twenty-first Amendment, the original understanding of that provision's relationship to the Commerce Clause, modern U.S. Supreme Court precedent, and a recent Eighth Circuit decision (concerning a similar Missouri residency requirement) all support their validity.  The majority viewing it differently, I respectfully dissent from this part of its decision and agree with its other conclusions.

*Constitutional text.*  The language of the pertinent constitutional provisions supports Tennessee's right to impose this requirement.  At the outset, the U.S. Constitution gave Congress power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3, and impliedly prohibited States from doing the same, *see* Albert Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 485 (1941); 2 The Records of the Federal Convention of 1787, at 625 (Max Farrand ed. 1966) (James Madison grew "more & more convinced" that the regulation of commerce among the States "was in its nature indivisible and ought to be wholly under one authority.").  Whatever else this Tennessee requirement does, it does not purport to displace or contradict congressional regulation of commerce among the States.  It merely announces a limited requirement for in-state sales of alcohol.

The end of Prohibition in 1933 made the States' authority over this issue more clear.  In repealing the Eighteenth Amendment, the Twenty-first Amendment allowed the States to regulate alcohol as a unique commercial article.  Unlike any other provision in the U.S.

Constitution, it sets up what is largely a regulatory regime of one: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, *in violation of the laws thereof*, is hereby prohibited." U.S. Const. amend. XXI, § 2 (emphasis added). After 1933, then, a State could continue to prohibit sales of alcohol within its territory. *Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 138 (1939). Or it could allow sales of alcohol on its own commercial terms, say by permitting only some types of alcohol to be sold within the State or by permitting sales only through state-run retailers or by permitting sales only through some other distribution system. The language of the amendment—prohibiting the "delivery or use" of alcohol "in violation of the laws" of each State—empowers States to regulate sales of alcohol within their borders. A two-year residency requirement to obtain a license to own a brick-and-mortar retail store, like a two-year residency requirement to operate a state-owned retail store, fits within the core authority delegated to the States by the Twenty-first Amendment.

*History*. A few screen shots of history support this interpretation. The itinerant regulation of alcohol over time captures the itinerant relationship between the power of the National Government and the States over time. Most areas of federal and state authority, including over commerce, initially were deemed largely exclusive, as a review of the enumerated powers delegated to Congress in Article I, Section 8 suggests. If Congress had authority over a form of commerce, the States usually did not. So too in the other direction. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 187–89, 197–200 (1824); *id.* at 226–27 (Johnson, J., concurring); *see also Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483 U.S. 232, 260 (1987) (Scalia, J., concurring in part and dissenting in part) ("The pre-emption of state legislation would automatically follow, of course, if the grant of power to Congress to regulate interstate commerce were exclusive . . . as John Marshall at one point seemed to believe it was."). Largely exclusive spheres of authority, not largely overlapping spheres of authority, thus were the initial order of the day.

But the congressional sphere of authority grew over time, as more and more "commerce" was treated as "among the several States." Even before Prohibition in 1920, the definition of interstate commerce had come to mean that the regulation of most products, including alcohol,

was increasingly a matter of state *and* federal law.  *See, e.g.*, *Leisy v. Hardin*, 135 U.S. 100, 121–23 (1890).  That helps to explain the federal laws concerning sales of alcohol before Prohibition.  Although the Supreme Court had held that the States could "regulat[e] and restrain[] the traffic" in liquor, including by "prohibiting it altogether," *The License Cases*, 46 U.S. (5 How.) 504, 577 (1847), it also held that they could not interfere with the liquor traffic "in the absence of congressional permission to do so," *Leisy*, 135 U.S. at 118, 124–25.  Those rulings spawned a series of congressional attempts to bolster state authority.  *See* Wilson Act of 1890, 27 U.S.C. § 121; Webb-Kenyon Act of 1913, 27 U.S.C. § 122.  They were largely unsuccessful.  One reason was that the Court held that the Commerce Clause prohibited a dry State from regulating unopened packages of alcohol—even though destined for illegal consumption in the State—because unopened packages remained articles of commerce.  *Rhodes v. Iowa*, 170 U.S. 412, 426 (1898).

This federal-state interplay also helps to explain the language of the Eighteenth Amendment, which first established that "the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited."  U.S. Const. amend. XVIII, § 1.  Section 2 of the Amendment then clarified overlapping federal and state authority to enforce Prohibition:  "The Congress and the several States shall have *concurrent power* to enforce this article by appropriate legislation."

With the passage of the Twenty-first Amendment, the States and Federal Government both had some regulatory power over alcohol but generally were thought to regulate it exclusively in different ways.  *Compare Indianapolis Brewing Co. v. Liquor Control Comm'n*, 305 U.S. 391, 394 (1939) (upholding Michigan statute prohibiting the sale of out-of-state beer against Commerce Clause challenge), *with William Jameson Co., Inc. v. Morgenthau*, 307 U.S. 171, 172–73 (1939) (per curiam) (upholding Federal Alcohol Administration Act's labeling requirements against Twenty-first Amendment challenge).  From the vista of 1933, a lawyer (and judge) would have presumed that the regulation of sales of alcohol *within* the State (such as a residency requirement for ownership of a retail liquor store) would be an exclusive state power given the existing paradigm of largely separate and exclusive spheres of regulatory power.

But over the next ten years, the Court's understanding of the Commerce Clause power changed. By the early 1940s, it was no longer true that regulations of commerce in the main were exclusively federal or exclusively state. The growth of the national commerce power, through the development of the "substantial effects" test, *Wickard v. Filburn*, 317 U.S. 111, 128–29 (1942), eliminated many (but not all) distinctions between intrastate and interstate commerce, making most businesses potentially subject to state *and* national regulation. The question was no longer "whether the right government was acting within the right sphere." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 377 (6th Cir. 2013) (Sutton, J., concurring) (quoting Ernest A. Young, *"The Ordinary Diet of the Law": The Presumption Against Preemption in the Roberts Court*, 2011 Sup. Ct. Rev. 253, 257).

That development altered the nature of the *implied* restrictions on state authority established by the Commerce Clause. An exclusive delegation of power to one sovereign implies a ban on assertions of power by another sovereign over the same matter. Just as Congress's exclusive power to "coin Money" implied a lack of state authority to do the same, U.S. Const. art. I, § 8, cl. 5, Congress's exclusive power to regulate interstate commerce among the States implied a lack of state power in the area. *See Smith v. Turner*, 48 U.S. (7 How.) 283, 393–96 (1849) (McLean, J.); The Federalist No. 42, at 263 (James Madison) (Clinton Rossiter ed. 2003); *but see Tyler Pipe*, 483 U.S. at 261 (Scalia, J., concurring in part and dissenting in part). Hence the need for the Court to create implied/negative/dormant Commerce Clause limitations on state authority, which was the only way to preserve the Federal Government's largely exclusive regulatory power over interstate commerce.

At their creation, the Court's dormant Commerce Clause cases were not just appropriate but necessary, as they provided the only way to keep the States on the one hand and Congress on the other in their separate and exclusive spheres of regulatory authority. But in a post-1930s world, in which the National Government and States largely have *overlapping* power over most sectors of commerce, the implementation of an implied restriction on state authority is much more difficult to articulate and police.

Which is what makes this case interesting—and complicated. From the vantage point of the understanding of the Commerce Clause circa 1933, the case looks easy. That's why Justice

Brandeis in 1936 would describe the States' authority to regulate sales of alcohol in such sweeping terms:

> The words used [in § 2] are apt to confer upon the State the power to forbid all importations which do not comply with the conditions which it prescribes. The plaintiffs ask us to limit this broad command. They request us to construe the Amendment as saying, in effect: The State may prohibit the importation of intoxicating liquors provided it prohibits the manufacture and sale within its borders; but if it permits such manufacture and sale, it must let imported liquors compete with the domestic on equal terms. To say that, would involve not a construction of the Amendment, but a rewriting of it.

*State Bd. of Equalization v. Young's Mkt. Co.*, 299 U.S. 59, 62 (1936). In the Court's view at that point, the Twenty-first Amendment gave the States what looked like largely plenary commercial authority (save for violations of individual rights guarantees, such as the Fourteenth Amendment) to regulate sales of alcohol within their borders, including in ways that the Commerce Clause would not otherwise allow. *Id.*

The congressional stance on regulation of alcohol at the time suggests a similar understanding. In the immediate aftermath of the Twenty-first Amendment's ratification, Congress overhauled Title 27 of the U.S. Code—"Intoxicating Liquors"—by repealing Chapters 1, 2, 4, 5, and 9 (dealing with production, transportation, and sale of liquor). 27 U.S.C. §§ 1–108, 221–28. Chapter 6, which includes the Wilson Act of 1890 (§ 121), Webb-Kenyon Act of 1913 (§ 122), and, many years later, the Twenty-first Amendment Enforcement Act of 2000 (§ 122a), all bolster state authority over alcohol. *See, e.g., id.* § 122a(b)–(c) (authorizing state Attorneys General to bring civil actions in federal court to enjoin "any act that would constitute a violation of a State law regulating the importation or transportation of any intoxicating liquor"). Chapter 8, the last enclave of federal oversight, concerns things like labeling. Federal Alcohol Administration Act, 27 U.S.C. §§ 201 et seq. But it leaves "transportation [and] importation . . . for delivery or use" (i.e., distribution) to the States, U.S. Const. amend. XXI, § 2, and even incorporates state-law requirements, like Tennessee's two-year residency rule for officers and directors, *see* 27 U.S.C. §§ 204(a)(2)(C), 204(d), 208(b)(2).

At the time the Twenty-first Amendment was ratified, a State's greater authority to ban all alcohol sales in the State included a lesser authority to regulate sales of alcohol in the State

with a heavy hand. *Ziffrin*, 308 U.S. at 138. Another way of putting it is this: The existence of the Commerce Clause *and* the Twenty-first Amendment makes it more difficult to imply a restriction on state authority (to regulate commerce) expressly created in another constitutional provision (to regulate retail sales of alcohol).

*Modern U.S. Supreme Court precedent.* The Court's more recent decisions in this area should be read against this backdrop, and are easier to follow (to my mind) in that context. Even if the meaning of the relevant constitutional provisions has migrated over the years, perhaps to account for the continued integration of domestic and international commerce, today's precedents still give the States authority to impose residency requirements on the owners of retail establishments that sell beer, wine, or liquor.

A consensus remains that the Twenty-first Amendment "created an exception to the normal operation of the Commerce Clause." *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 712 (1984). While the size of that exception may be fickle, a few constant rules remain. On one side of the ledger, the Commerce Clause still limits state efforts to regulate activity outside of a State's territorial domain. *See, e.g.*, *Healy v. Beer Inst.*, 491 U.S. 324, 343 (1989) (invalidating price-affirmation statute regulating liquor sales in other States); *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 273, 276 (1984) (invalidating discriminatory tax on out-of-state liquor); *Capital Cities*, 467 U.S. at 714 (invalidating ban on TV wine ads emanating from other States); *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 114 (1980) (invalidating resale price maintenance and price posting statutes); *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 331–32 (1964) (invalidating regulation of alcohol passing through JFK Airport that would not be used until arrival at international destination); *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 533–34 (1938) (invalidating state restriction on shipments to a federal enclave in its borders).

On the other side of the ledger, exceptions to the normal operation of the Commerce Clause remain alive and well in some areas—in particular the in-state nature of alcohol distribution. The States retain "virtually complete control" over "how to structure the[ir] liquor distribution system[s]." *Granholm v. Heald*, 544 U.S. 460, 488 (2005). All thus agree that the States retain authority (1) to ban alcohol completely, (2) to distribute liquor exclusively through

state-run monopolies, or (3) to operate distribution systems, including through regulations that require retailers and wholesalers to reside in-state. *Id.* at 489. Because liquor distribution implicates the States' core interests after the repeal of Prohibition, such regulations are generally "protected under [§ 2] when they treat liquor produced out of state the same as its domestic equivalent." *Id.* State authority in this area is "virtually" limitless, at least when it comes to the Commerce Clause. *Id.* at 488. State regulations of in-state distribution, even if facially discriminatory, are constitutional unless a challenger can show that they serve no purpose besides "economic protectionism." *Bacchus*, 468 U.S. at 276.

Measured by these standards and cases, Tennessee's two-year residency requirement should survive. We must start with the assumption that tiered distribution systems are "unquestionably legitimate." *Granholm*, 544 U.S. at 489. As part of these systems, the States may require retailers and wholesalers to reside within their borders. *See id.* And if the States may do that, they must "have flexibility to define the requisite degree of 'in-state' presence" necessary for participating as a retailer or wholesaler. *S. Wine & Spirits v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 810 (8th Cir. 2013). Tennessee's two-year residency rule and its application of that rule to a retailer's officers and directors lawfully exercise that authority.

Promoting responsible consumption and orderly liquor markets "fall within the core of [Tennessee's] power" under § 2. *North Dakota v. United States*, 495 U.S. 423, 432 (1990). Retailers are critical to serving those interests. Because they form the final link in the distribution chain, retailers are closest to the local risks that come with selling alcohol, such as "drunk driving, domestic abuse, [and] underage drinking." *S. Wine & Spirits*, 731 F.3d at 811. Tennessee reasonably concluded that requiring retailers to reside in the communities that they serve would further "health, safety and welfare." Tenn. Code Ann. § 57-3-204(b)(4). Tennessee's method for establishing in-state residency also makes sense. Requiring individual retailers to reside in one place for a sustained, two-year period ensures that they will be knowledgeable about the community's needs and committed to its welfare. The only way to know a community is to live there, which may explain why Congress requires federal court of appeals judges to live within their circuits, 28 U.S.C. § 44(c), and district court judges to live within their districts, *id.* § 134(b).

The same is true with respect to a residency requirement for officers and directors of the retailer. It ensures that they are familiar with the community and in a position to alter or influence the retailer's behavior based on that understanding. *See* Tenn. Code Ann. §§ 48-18-101(b), 301(b)(1), 402, 403(b)(1). The Federal Alcohol Administration Act, notably, also regulates officers and directors of liquor companies. *See, e.g.*, 27 U.S.C. § 208.

*Court of appeals precedents.* The post-*Granholm* circuit precedents likewise support this conclusion. Several courts agree that *Granholm* drew a line between regulation of (out-of-state) producers and regulation of (in-state) wholesalers and retailers, requiring rigorous review of the former and deferential review of the latter. *See Freeman v. Corzine*, 629 F.3d 146, 158 (3d Cir. 2010); *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 189 (2d Cir. 2009); *Brooks v. Vassar*, 462 F.3d 341, 352 (4th Cir. 2006); *cf. Cooper v. Tex. Alcoholic Beverage Comm'n* (*Cooper II*), 820 F.3d 730, 743 (5th Cir. 2016) (dormant Commerce Clause applies "to a lesser extent when the regulations concern the retailer or wholesaler tier as distinguished from the producer tier").

One circuit has approved requirements nearly identical to Tennessee's. In a thoughtful opinion by Judge Colloton, the Eighth Circuit upheld a three-year residency requirement in Missouri for wholesalers' officers, directors, and 60% of their stockholders. *S. Wine & Spirits*, 731 F.3d at 802–03. We should do the same for Tennessee's two-year requirement.

*Jelovsek v. Bredesen*, 545 F.3d 431 (6th Cir. 2008), does not change things. That case, it is true, invalidated a law that "requir[ed] a two-year Tennessee residency." *Id.* at 438. But the requirement applied only to wine *production*. *See* Grape and Wine Law, Tenn. Code Ann. § 57-3-207 (regulating "winer[ies]" and "farm wine producer[s]"). It thus did not "treat liquor *produced out of state* the same as its domestic equivalent." *Granholm*, 544 U.S. at 489 (emphasis added). State laws that *do* treat out-of-state products the same, like Tennessee's retail residency rules, are generally "protected under the Twenty-first Amendment." *Id.*

Isn't it still true that the requirements here are "discriminatory on their face," just like the ones in *Jelovsek*? But in-state distribution regulations in one sense always discriminate against out-of-state interests, as *Granholm* illustrates. *See* 544 U.S. at 466, 489; *id.* at 517–19, 521–22 (Thomas, J., dissenting). At the same time, however, such regulations may serve a State's core

concerns under the Twenty-first Amendment—for instance, by reducing in-state supply, increasing the price of liquor, or even regulating it in a way that increases (or limits decreases in) the price of liquor. *Cf. 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 504–05 (1996). It thus does not matter whether an in-state distribution regulation discriminates against out-of-state interests. What matters is what type of discrimination is *permissible*. This one is, and *Jelovsek* says nothing about that question.

The Fifth Circuit, I acknowledge, refused to enforce a residency requirement for holders of a "mixed beverage permit" and 51% of their stockholders. *Cooper II*, 820 F.3d at 734–35; *see* Tex. Alcoholic Bev. Code Ann. § 28.01. In *Cooper II*, the Texas Package Stores Association asked the court to grant relief from a twenty-five-year-old injunction that allowed a Texas strip club to retain its permit after it was acquired by owners living in Florida and Tennessee. *See* Fed. R. Civ. P. 60(b)(5). The Fifth Circuit denied relief because *Granholm* did not effect "a significant change in decisional law." *Cooper II*, 820 F.3d at 740–41.

Putting this unusual posture to the side, the Fifth Circuit appears to have misread *Granholm* when it concluded that "[d]istinctions between in-state and out-of-state retailers and wholesalers are permissible only if they are an inherent aspect of" a State's distribution system. *Id.* at 743. Because "[t]here is no archetypal three-tier system from which [to glean] the 'integral' or 'inherent' elements," the Fifth Circuit's test creates the risk that a court will unnecessarily substitute its own judgment for that of a state legislature about the best policies for regulating liquor. *S. Wine & Spirits*, 731 F.3d at 810. *Granholm* did more than authorize States to maintain some sort of liquor distribution system; it gave them "virtually complete control" over "how to structure th[at] . . . system." *Granholm*, 544 U.S. at 488. It matters not that one can imagine other ways a distribution system could function because "[t]here is no narrow tailoring requirement under the Twenty-first Amendment." *S. Wine & Spirits*, 731 F.3d at 812.

I agree with my colleagues, however, that two aspects of Tennessee's scheme must fall: its application of the residency requirement to 100% of a retailer's stockholders, Tenn. Code Ann. § 57-3-204(b)(3)(A), (B), (D), and its imposition of a ten-year residency requirement for renewal of a license, *id.* § 57-3-204(b)(2)(A).

A requirement that every stockholder reside in Tennessee does not further the State's interest in responsible retailers. Tennessee's Business Corporations Act states that company management—directors and officers—shall exercise "[a]ll corporate powers." *Id.* §§ 48-18-101(b), 402; *see also id.* § 48-18-101(c). While stockholders still may exert influence over their agents, 51% of the stockholders—not 100%—is usually all it takes to do so. Unlike Missouri, Tennessee did not focus on closely held corporations or require a simple- or super-majority of stockholders to be residents. *See S. Wine & Spirits*, 731 F.3d at 802–03 (citing Mo. Rev. Stat. § 311.060.3). I see no way to explain this all-or-nothing-at-all stockholder requirement as doing anything other than promoting economic protectionism.

The same goes for Tennessee's residency rule for renewal of a license. Although Tennessee grants an initial retail license after two years of in-state residence, it grants renewal of that very license only after *ten* years of residence. Tenn. Code Ann. § 57-3-204(b)(2)(A). Tennessee offered no reason why a person who has resided in the State for two years is deemed local enough to begin operating a retailer in year 3, but not local enough to continue running it in year 4. Even that might not have been a problem if initial licenses lasted for ten years. But the retail license "expire[s] twelve (12) months following the date of its issuance." *Id.* § 57-3-213(a). That is the epitome of arbitrariness.

The court offers two key responses to my conclusion that Tennessee's two-year residency requirement for alcohol retailers does not violate the Constitution. One involves history. The court is right that *Granholm* "conducted an extensive historical analysis." *Supra* at 5 n.2. My point is that *Granholm* focused on the history in the run-up to Prohibition and concluded that, by constitutionalizing the Wilson and Webb-Kenyon Acts, the Twenty-first Amendment incorporated a pre-existing anti-discrimination principle. *See* 544 U.S. at 476–86. That's why the Court distanced itself from the sweeping language in *Young's Market*. But that principle concerned discrimination against out-of-state *products*. *See* Wilson Act, 27 U.S.C. § 121 (making all imported liquors "subject to the operation and effect of the laws of such State . . . to the same extent and in the same manner as though such . . . liquors had been *produced* in such State"); *Granholm*, 544 U.S. at 483–84 ("The Wilson Act reaffirmed, and the Webb-Kenyon Act did not displace, the Court's line of Commerce Clause cases striking down state laws that

discriminated against liquor *produced* out of state."); *id.* at 486 ("[T]he Twenty-first Amendment . . . does not displace the rule that States may not give a discriminatory preference to their own *producers*.") (emphases added).  It is *that* history that was at issue in *Granholm*.  Even if we can no longer read *Young's Market* for all it is worth, the Court never purported to overrule its other decisions and holdings approving state authority over alcohol *distribution* as opposed to *production*.

The court's second response is of a piece—to focus on language from *Granholm* (in truth one sentence from *Granholm*) to suggest that traditional dormant Commerce Clause principles apply in full to liquor production *and* distribution, notwithstanding the Twenty-first Amendment. *See supra* at 5 n.2, 11 & n.5, 14 n.7 (quoting 544 U.S. at 487).  That cuts to the heart of the debate:  Did *Granholm* mean to treat alcohol, including distribution of alcohol, like any other commodity when it comes to the Commerce Clause?  If so, the court is right.  But as I see it, the text of the Twenty-first Amendment, the history of alcohol regulation in this country, Supreme Court and circuit court precedent, and *Granholm* itself all point in the other direction.  Until the Supreme Court says so, we may not assume that the Twenty-first Amendment no longer "create[s] an exception to the normal operation of the Commerce Clause." *Capital Cities*, 467 U.S. at 712.  "An extension of this sort is not for us to make." *Arnold's Wines*, 571 F.3d at 201 (Calabresi, J., concurring).

For these reasons, I respectfully concur in part and dissent in part.